**HOLLOWAY CONCRETE PRODUCTS COMPANY, Inc., Appellant,**

v.

**BELTZ-BEATTY, INC., et al., Appellees.**

**No. 18414.**

United States Court of Appeals Fifth Circuit.

Aug. 3, 1961.

Monroe E. McDonald, Sanders, Mc-Ewen, Schwarz & Mims, Orlando, Fla., for appellant.

Alton G. Pitts, of Maguire, Voorhis & Wells, Orlando, Fla., for Aetna Casualty & Surety Co.

J. Thomas Gurney, of Gurney, Mc-Donald & Handley, Orlando, Fla., for Beltz-Beatty, Inc. and John L. Brumley.

Tom Watson, of Watson & Watson, Orlando, Fla., for J. Ross Bechtel and Samuel Faron.

Before TUTTLE, Chief Judge, and JONES and WISDOM, Circuit Judges.

TUTTLE, Chief Judge.

This is an appeal by the owner of a motor cruiser from a judgment of the trial court, sitting in admiralty, denying its plea to limit liability under 46 U.S.C.A. § 183, and assessing damages for losses incurred by others from an explosion and fire which occurred on board the boat.

Appellant owned the Overtime, a 27-foot cabin cruiser. For sometime it had been used almost entirely by its President, Williamson. Gradually Williamson lost interest in the boat and the Company, acting through Williamson, permitted Thomas Ross, an engineer employed by the Company, to use it pretty much as he wished. For sometime prior to the accident no one but Ross had made any use of the boat. He had used it on July 3rd, the day before the accident, and discovered that there was something defective with the bilge pump. On July 4, 1957, Ross was on board the boat with his friend Emerson for the purpose of causing some repairs to be made to the pump.

The occurrences just prior to the explosion and fire are not in dispute. The boat was powered by a gasoline engine which was started by a self-starter activated by a storage battery. The battery equipment consisted of two 8-volt batteries in a single box, separated by a frame. Each of the batteries was connected to the starter button through a switch which could select one but not both of the batteries for starting the engine. There was also a switch connection which could be used to operate a blower.

On the day of the fire Ross turned on the blower in order to ventilate the bilge. He then turned to the gasoline valve to permit the fuel to run to the engine and then attempted to start the engine by pressing the starter. The first battery was too weak to start the motor. He thereupon switched to the other battery in an effort to start it; it was also too weak.

On similar occasions previously Ross had connected the two batteries in series, that is he connected the positive pole of one battery to the negative pole of the other, which would be calculated to sup-

ply whatever power both batteries had to the starter. In order to do this he needed to have another person hold a connecting wire between the poles of the two batteries, while he, himself pressed the starter button.

Ross undertook to explain to Emerson, who was on the boat for the first time, how to hold the wire across the batteries so that Ross could then go forward and press the starter button. While he was bent down over the battery demonstrating the connection, with Emerson looking over his shoulder, an explosion occurred, setting a fire that destroyed the boat and caused the damage to the other property that is here sued for.

■ In order for appellees to recover for their damages they must prove that the explosion and fire were proximately caused by negligence. Even then recovery against Holloway would be denied under the limitation of liability provisions of Section 183, 46 U.S.C.A., if Holloway proved that the loss was occasioned without the privity or knowledge of the owner. Appellees relied on proof that Ross used an unsafe and dangerous method of attempting to start the motor at a time when there must have been present an accumulation of gasoline fumes, readily ignitable by a spark, as establishing negligence on the part of Ross. They undertook to establish privity or knowledge on the part of Holloway first by attempting to show that Ross was the responsible corporate official charged with the duty of handling the boat, or, in the alternative, that the very operation performed by Ross was done in a manner known and approved by the president of the corporation.

The trial court made brief findings of fact.[1] These findings were in favor of the appellees' contentions with respect to both matters touching on knowledge and privity. Then, without dealing with the matter in terms of negligence the trial court made the following conclusions of law:

"The unsafe and dangerous method used to start the motor on the 'Overtime' made the boat unseaworthy at the time of and prior to the accident. This condition was known to Williamson, the president of petitioner for some time prior to the accident. The petitioner, there-

dent of the petitioner corporation employed the same process for the purpose of starting the engine and was therefore fully familiar with the condition, and in fact had demonstrated to Ross the procedure. The method thus used to start the motor was calculated to and often did produce sparks capable of igniting any sufficient accumulation of gasoline fumes present in the area of the batteries.

"The boat was equipped with a blower, the purpose of which was to extract and eliminate the accumulated gasoline fumes from the bilge, and this would reduce or eliminate the danger of an explosion. The explosion and fire was the result of the ignition of accumulated fumes by means of the sparks caused by the use of jumper wires.

"Mr. Williamson had placed the 'Overtime' in the custody of defendant's employee, Ross, and on a few occasions the boat was used for the purpose of entertaining prospective customers of the defendant. Ross frequently used the boat for his own purposes."

---

1. These findings are as follows:

"Petitioner was the owner of the 'Overtime,' a small inboard day cruiser which exploded, burned, and sank on July 4, 1957 while moored at Sanford Boat Works in Sanford, Florida. The explosion and fire resulted from an attempt to start the motor by use of a hot shot battery with the use of what is designated as jumper wires used to transmit current from hot shot battery to the uncharged battery thence to the starter. This operation was made necessary because the main battery of the boat at the time of the accident was not sufficiently charged to start the motor. The attempt thus to start the motor was made by Thomas Ross, an employee of the defendant corporation with the assistance of one Francis Emerson. Ross had Emerson hold the jumper wires on the poles of the batteries while Ross activated the starter for the engine. The explosion and fire resulted from this procedure.

"The jumper wires thus used by Ross had been kept aboard the boat for several months during which time on at least three occasions Frank Williamson, presi-

fore, had knowledge and privity and is therefore liable for all damage proximately resulting from the accident. The petition for limitation of liability is denied."

■ Appellant vigorously attacks several of the findings of fact, and also the relevance of the conclusion that the boat was "unseaworthy at the time of and prior to the accident." Careful consideration of these contentions brings us to the conviction that in several important respects the findings are not supported by the evidence. The first of these instances is the trial court's finding, "Ross had Emerson hold the jumper wires onto the poles of the batteries while Ross activated the starter for the engine. The explosion and fire resulted from this procedure." The record is absolutely clear that Emerson had nothing to do with holding the wires but, rather, that the explosion and fire followed a demonstration by Ross while he was undertaking to show Emerson how to hold the wires in order that Ross might later press the starter button.

One having even slight knowledge of electricity may wonder how the touching of the wire on the poles of the two batteries in the manner testified to by Ross could cause the spark that the trial court found to have caused the explosion, since the starter button was not pressed and the circuit was thus apparently "open." This may be explained by the testimony that the blower fan was then being operated, it thus being clear that the circuit was closed after all.

As we have stated, the explosion did not occur as found by the trial court. It may be that if the boat had not blown up Ross *would have caused* Emerson to hold the connecting wire across the poles, and Ross *would have pushed* the starter button and the boat might then have blown up the same way. Of course, on the other hand it may be that before he would have done these things Ross might have cut off the blower to get all the pow-

er available for the starter. In such circumstances, the circuit would then have been open, and if Emerson made a firm connection with the jumper wire before Ross pressed the starter button, there might never have been a spark at all. All of this, of course, is speculation and is mentioned only because we feel that it is necessary to analyze the court's finding against the true facts in order to determine whether it can be approved as a basis for the ultimate conclusion, even though not accurate. We conclude that this particular finding is too remote from what actually happened to support a finding of unseaworthiness or of negligence.

This is not to say, of course, that the trial court could not have found that Ross was negligent for doing exactly what he did do—attempting to bridge the batteries while the circuit (probably through his oversight) was closed. We cannot, however, speculate as to this. The finding of the court of unseaworthiness or negligence [2] because of his pressing the starter while Emerson held the wire cannot be sustained on a record which shows that this is not what happened.

Further, the finding of the court that "the President of petitioner corporation employed the same process for the purpose of starting the engine, and was therefore fully familiar with the conditions," is not supported by the record. The undisputed testimony of Williamson is that he knew nothing about a "jumper wire"; that on several occasions when he had found the battery dead, "the only thing I did was to take a live battery and hook it up and run it through the dead battery." It is not apparent that on such occasions when Williamson connected two batteries in this manner the same condition existed as obtained when the explosion occurred; that is, it is not apparent that when Williamson connected the poles of a live and dead battery the electrical circuit was closed. The trial court did not find that under *no* circumstances could such a connection be made

---

**2.** Although there was no finding of negligence in its formal findings, the court said it was prepared to find that Ross was negligent.

without constituting negligence. Without claiming for ourselves knowledge of even elementary laws of electricity, we think it appropriate to raise the question whether the trial court could find that *any* connection of two batteries, even if the circuits were open, would amount to the same kind of negligence that Ross's act constituted in connecting the terminals of two batteries at a time when one of them was discharging electrical current into a closed circuit. The trial court's finding that Williamson knew of the "condition" cannot be supported merely by the testimony that Williamson had taken a live battery and hooked it up and run it through the dead battery.[3]

This may appear to be a small or incidental matter, but in fact it may make all the difference between safety and negligence whether an electrical connection is made when the circuit is closed (probably inevitably causing a spark), or a firm connection is completed before the circuit is closed so that there may be no spark. Unfortunately in this case it may have meant all the difference between life and death for Emerson that Ross connected the terminals of the two batteries while the blower was operating. We do not determine whether the trial court could have found that *any* connection between two different batteries, regardless of the position of the switch, would have been negligence under the circumstances. We cannot affirm the findings here, however, because they are not supported by the evidence.

We next come to the conclusion by the court that the boat was "unseaworthy" and that this condition was known to Williamson. Since the conclusion of un-

seaworthiness was based on an incorrect finding of what actually happened and on what Williamson himself knew, the finding would have to be set aside even if the issue of seaworthiness were a relevant issue in this case.

So long as there was a claim for the death of Emerson in the case, see Emerson v. Holloway Concrete Products Co., Inc., 5 Cir., 282 F.2d 271, the issue of seaworthiness may have been relevant. With that claim no longer before the court there is no longer any issue of seaworthiness, since the warranty of seaworthiness does not, in any event, extend to the parties whose property was damaged by the fire resulting from the explosion. They are neither the owners of cargo nor are they in the class of those entitled to the extra protection given by the law to seamen and others aboard "doing a seaman's work and incurring a seaman's hazards." Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 880, 90 L.Ed. 1099; Republic of France v. United States of America, 5 Cir., 290 F.2d 395.

Having found that the appellant's boat was unseaworthy, the trial court seemed not to consider it necessary to make a formal finding or conclusion as to negligence. The conclusion as to knowledge and privity, however, is ordinarily referable to acts of negligence and it may well be that the trial court intended to include a finding of negligence in its finding of unseaworthiness. This conclusion, however, so far as appears, is based on an incorrect finding of what actually occurred, as demonstrated above, and of what Williamson knew and did.

3. It does not seem that the trial court could find the conduct to be the same, merely because the poles of the batteries were "touched" and because of the testimony of one of the expert witnesses who said, "you get a spark any time you touch the terminals of a battery." This same witness testified that the safe way to handle a dead battery was to remove it, charge it, and then install it. Obviously, this method itself required that the terminals be "touched". The question arises whether the safety of this method itself does not depend on whether the circuit was open or closed. The next question would be whether, if this was the real test, then might this not be the critical fact in any other method of dealing with the battery connections. The trial court may find it necessary to have an answer to these questions if actual knowledge of Ross's practice is to be attributed to Williamson.

 The trial court made a further finding that "Williamson had placed the 'Overtime' in the custody of defendant's employee Ross." This finding, to some extent at least, supported the appellees' contention that the corporation was "in privity" with Ross in whatever acts he took. In this connection it must be borne in mind that under the limitation statute, if an agent or servant of the owner negligently injures another in the operation of a vessel ordinary rules of *respondeat superior* do not apply. The owner of the vessel is entitled to have his liability limited to the value of the vessel if the loss "was occasioned without the privity or knowledge of the owner."

The meaning of the term "privity" in the case of a corporate owner is made plain by the opinion of the Supreme Court in Coryell v. Phipps, 317 U.S. 406, at page 410, 63 S.Ct. 291 at page 293, 87 L.Ed. 363, where the Court said:

> "A corporation necessarily acts through human beings. The privity of some of these persons must be the privity of the corporation else it could always limit its liability. Hence the search in those cases to see where in the managerial hierarchy the fault lay."

We think the evidence in this record supports a finding that responsibility for the boat and its operation has been delegated by conduct and custom, although not expressly, to Ross. If this is what the court meant by saying, "Mr. Williamson had placed the 'Overtime' in the custody of defendants employee Ross," it would, we think, support a conclusion that there was such privity as would deny appellant's right to limitation if Ross is found to be negligent for the acts which the record shows he actually did.

Thus, we find that the judgment must be reversed because essential findings of fact are without evidentiary support, although without, of course, saying that the record would not support findings, if made, that would warrant a finding of negligence; also because the conclusions upon which the judgment was based rely on the concept of unseaworthiness, which imports absolute liability of the owner, whereas unseaworthiness is not relevant as to claims by these appellees; and whereas, also, the finding of unseaworthiness itself is based on unsupported findings of fact. Although we might speculate on whether the trial court would find Ross guilty of negligence for what he actually did and whether the trial court would find in Ross the managerial control essential to establish privity, or, failing that, sufficient knowledge by Williamson touching on the connection of batteries in general (assuming that to be the cause of injury), we think it would be improper for us to do this. These are matters that must be determined in the first instance by the trial court.

In order to permit such findings and conclusions as the trial court deems proper on the present record, or the present record with such additional evidence as the trial court considers appropriate, the judgment must be reversed and the case

Remanded.