HOLLOWAY CONCRETE PRODUCTS COMPANY, Inc., Appellant,

v.

BELTZ–BEATTY, INC., et al., Appellees.

No. 19741.

United States Court of Appeals
Fifth Circuit.

Sept. 12, 1963.

Monroe E. McDonald and Sanders, McEwan, Schwarz & Mims, Orlando, Fla., for appellant.

Alton G. Pitts, of Maguire, Voorhis & Wells, Orlando, Fla., for Aetna Casualty & Surety Co.

Tom Watson, of Watson & Watson, Orlando, Fla., for J. Ross Bechtel and Samuel Faron.

John M. Cain, of Gurney, Gurney & Handley, Orlando, Fla., for Beltz-Beatty, Inc. and John L. Brumley.

Before TUTTLE, Chief Judge, and JONES and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

This is the second time we have reviewed this case, the same having been before this court on appeal in Holloway Concrete Products Co. v. Beltz-Beatty, Inc., 293 F.2d 474 (1961).[1] The facts essential to an understanding of this case are sufficiently set out in our previous opinion. There we reversed the trial court for the reasons, among others, that; (1) unseaworthiness was not an issue since the claimants were not members of that class entitled to the extra protection afforded by the doctrine of the warranty of seaworthiness; and (2) assuming that the trial court intended to include a finding of negligence in reaching its conclusion of unseaworthiness, such conclusion was based on an incorrect finding of what actually occurred as demonstrated by the record. Our former opinion made it clear that we were not holding that the record would not in its then state support a finding of negligence;[2] and further we held that the record would support a proper finding of privity so as to deny limitation of liability.[3] The case was remanded to " * * * permit such findings and conclusions as the trial court deems proper on the present record, or the present record with such additional evidence as the trial court considers appropriate * * * ".

Upon remand the trial court entered new conclusions and findings of fact based on the same record without taking additional evidence.[4] We are of the opinion that the record amply supports these

1. Of interest so far as the history of the events involved is concerned, is the case of Emerson v. Holloway Concrete Products Co., Inc., 5 Cir., 1960, 282 F.2d 271; but different questions were there under consideration.

2. The following is from the opinion:
"Thus, we find that the judgment must be reversed because essential findings of fact are without evidentiary support, although without, of course, saying that the record would not support findings, if made, that would warrant a finding of negligence; also because the conclusions upon which the judgment was based rely on the concept of unseaworthiness, which imports absolute liability of the owner, whereas unseaworthiness is not relevant as to claims by these appellees; and whereas, also, the finding of unseaworthiness itself is based on unsupported findings of fact. Although we might speculate on whether the trial court would find Ross guilty of negligence for what he actually did and whether the trial court would find in Ross the managerial control essential to establish privity, or, failing that, sufficient knowledge by Williamson touch-

ing on the connection of batteries in general (assuming that to be the cause of injury), we think it would be improper for us to do this. These are matters that must be determined in the first instance by the trial court."

3. We quote from the opinion:
"We think the evidence in this record supports a finding that responsibility for the boat and its operation has been delegated by conduct and custom, although not expressly, to Ross. If this is what the court meant by saying, 'Mr. Williamson had placed the "Overtime" in the custody of defendants employee Ross,' it would, we think, support a conclusion that there was such privity as would deny appellant's right to limitation if Ross is found to be negligent for the acts which the record shows he actually did."

4. Pertinent findings of fact and conclusions of law by the trial court are as follows:
"2. Petitioner was the owner of the 'Overtime', a 27-foot cabin cruiser which exploded, burned and sank on July 4, 1957, while moored at Sanford

findings. Based upon the facts found, the trial court concluded as a matter of law that the appellant's agent was guilty of negligence which proximately caused the claimants' damages; and that the appellant was in privity with the agent's

Boat Works on the St. Johns River at Sanford, Florida.

"3. The boat was powered by an inboard gasoline engine which was started by a self-starter, which in turn was activated by a storage battery.

"4. There were two electric storage batteries on the boat which were used for starting the engine, furnishing electric spark for the ignition system, and for operating the electrical accessories. The batteries were situated in the same battery case and were located below the deck of the boat in the bilge area. The batteries were located within two feet of one side of the gasoline engine, were on the same side of the engine as were the fuel pump and carburetor, and were in the same bilge area where the gasoline lines and storage tanks were.

"5. Each of the batteries was connected to the starter button through a switch which could select one but not both of the batteries for starting the engine. There was a switch which could be used to activate a blower, which was used to ventilate the bilge area. The blower was powered by an electric motor which received its power from the storage battery.

"6. On July 3, 1957, Thomas Ross in company with others, had used the boat. On that occasion, Ross encountered some difficulty with the bilge pump on the boat. He made temporary repairs to the bilge pump and continued using the boat. On July 4, 1957, Ross, in company with Francis Emerson, went to the Sanford Boat Works— where the boat was habitually moored— with the intention of removing the bilge pump from the boat and taking it to the shop of petitioner for repair.

"7. When Ross and Emerson reached the boat, Ross discovered that a quantity of water had accumulated in the bilge area and he decided to pump this water overboard before removing the bilge pump from the boat. The bilge pump was electrically operated and received its energy from the storage battery. In order to prevent exhaustion of the battery while operating the bilge pump, Ross decided to start the gasoline engine so that its generator could supply electricity to the storage battery while the battery operated the bilge pump.

"8. Ross opened several hatch covers in the deck, turned on the switch to activate the bilge blower, moved the battery selector switch so as to engage one of the batteries, turned on a gasoline valve so as to allow gasoline to be pumped out of the storage tank, and then went to the starter button located at the steering wheel. Upon his pressing the starter button, Ross found that the battery which was connected at that time was too weak to start the gasoline engine. Ross then tried the other battery and found it too weak to start the engine.

"9. Ross then decided to connect the two batteries in series; that is, to connect the positive pole of one battery to the negative pole of the other battery so as to use the combined strength of both batteries. In order to accomplish this he needed to have someone hold a connecting wire between the poles of the batteries, while he went to the starter button to press it. Ross undertook to explain to Emerson, who was on the boat for the first time, how to hold the wire across the poles of the batteries so that he, Ross, could go to the starter button and press it. While Ross was bent down over the battery demonstrating to Emerson how the connection was to be made, with Emerson looking over his shoulder, an explosion occurred in the bilge of the boat, setting a fire that destroyed petitioner's boat and causing the damage to other boats and the boat works here being used for.

"10. The explosion and fire were caused by the ignition of a quantity of gasoline and gasoline vapors which were in the bilge of the boat. The ignition was caused by a spark produced when Ross connected the poles of the batteries together, with the connecting wire while he was making the demonstration to Emerson. At the time Ross connected the poles of the batteries with the connecting wire, the bilge blower was turned on and was operating; thus, the electrical circuit was closed at the time Ross made the connection with the wire. Ross had turned on the bilge blower before making the first attempt to start the gasoline engine, and he left the bilge blower turned on from that time until the explosion.

"11. There were no closed compartments in the bilge area from the position of the gasoline engine back to the position of the gasoline storage tanks in the stern. Gasoline or gasoline fumes

negligence and therefore, the petition for exoneration and limitation of liability should be denied.

We agree with the conclusions reached by the trial court, both as to the facts and the law. The record evidence supports the facts found; and the facts found support the legal conclusions reached.

The judgment is affirmed.

emanating from the storage tanks, or from the line from the storage tanks to the engine, or from the fuel pump, or from the carburetor, were free to circulate or settle in any part of this bilge area. There was also kept in this same bilge area a small gasoline powered outboard motor which had a gasoline tank on it with a ventilator cap to allow vapor to escape. Gasoline was sometimes kept in this tank on the outboard motor.

"12. Ross knew, or in the exercise of ordinary care, would have known, that to connect the positive pole of one battery to the negative pole of the other battery, in the manner used by him at a time when the blower was operating, would probably cause a spark to be produced. Ross knew, or in the exercise of ordinary care should have known, that it was dangerous to produce a spark in the bilge area where gasoline fumes are not to be unexpected. The presence of gasoline fumes in the bilge of a boat is common enough that this particular boat, along with many other boats, was equipped with a blower, the purpose of which was to evacuate such fumes. There was water standing in the bilge of the boat, which would have raised the level of any free gasoline or gasoline fumes closer to the level of the batteries, a fact which Ross knew or should have known.

"13. Ross had used the same method of connecting the batteries together for the purpose of starting the engine on approximately a dozen occasions before the day of the explosion. On some of the prior occasions, he had noticed that a spark was produced by the connection. On other occasions, he observed no spark at the time he made the connection.

"14. Petitioner purchased the boat in the year 1954, and for some time after that it was used almost entirely by Mr. Franklyn Williamson, president of petitioner. Gradually, Williamson lost interest in the boat and petitioner, acting through Williamson, permitted Ross to use the boat pretty much as he wished. For approximately a year prior to the explosion no one but Ross had made any substantial use of the boat.

"15. At the time of the explosion and for several months immediately preceding it, the petitioner had delegated, by conduct and custom, to Ross the responsibility for the boat and its operation.

"16. At the time of the explosion, Ross was head of the construction engineering department of the petitioner corporation. He had no other supervisor, boss, or principal in the corporation than Williamson, the president. The business of the corporation was carried out through Williamson, the president, and five department heads; Ross was one of them.

"17. Ross was such a person as would make his act with reference to the maintenance or operation of the boat the act of petitioner corporation, and would make the petitioner corporation in privity with any act of Ross as regards the maintenance or operation of the boat.

"18. Claimants Samuel Faron, J. Ross Bechtel, Aetna Casualty & Surety Company, John L. Brumley and Beltz-Beatty, Inc., all sustained damage resulting from the explosion and fire which originated upon petitioner's boat. The claims of these claimants have previously been referred to Heskin A. Whittaker, who was appointed Commissioner of this Court, for the purpose of determining the amounts of such claims. The report of Heskin A. Whittaker as Commissioner has been filed with the Court.

"Conclusions of Law.

"The Court makes the following conclusions of law:

"(1) Thomas Ross was guilty of negligence in attempting to start the engine of the boat in the manner found above;

"(2) Ross' negligence was the proximate cause of damage to the claimants;

"(3) Petitioner is in privity with the negligence of Ross;

"(4) The petition for exoneration of liability should be denied;

"(5) The petition for limitation of liability should be denied;"