CONSUMERS IMPORT CO. ET AL. *v.* KABUSHIKI KAISHA KAWASAKI ZOSENJO ET AL.

No. 32. Argued October 21, 1943.—Decided November 8, 1943.

Mr. T. Catesby Jones, with whom Messrs. D. Roger Englar, Ezra G. Benedict Fox, and Thomas H. Middleton were on the brief, for petitioners.

Mr. George C. Sprague for respondents.

MR. JUSTICE JACKSON delivered the opinion of the Court.

Petitioners, Consumers Import Company and others, hold bills of lading covering several hundred shipments of merchandise. The shipments were damaged or destroyed by fire or by the means used to extinguish fire on board the Japanese ship Venice Maru on August 6, 1934, on voyage from Japan to Atlantic ports of the United States. Respondent Kabushiki Kaisha Kawasaki Zosenjo owned the Venice Maru and let her to the other respondent, Kawasaki Kisen Kabushiki Kaisha, under a bareboat form of charter. The latter was operating her as a common carrier.

Damage to the cargo is conceded from causes which are settled by the findings below, which we decline to review.[1] Upwards of 660 tons of sardine meal in bags was stowed in a substantially solid mass in the hold. In view of its susceptibility to heating and combustion it had inadequate ventilation. As the ship neared the Panama Canal, fire broke out, resulting in damage to cargo and ship. The cause of the fire is found to be negligent stowage of the fish meal, which made the vessel unseaworthy. The negligence was that of a person employed to supervise loading to whom responsibility was properly delegated and who was qualified by experience to perform the work. No negligence or design of the owner or charterer is found.

---

[1] The facts are considered at length in the opinion of the Court of Appeals, 133 F. 2d 781.

The cargo claimants filed libels *in rem* against the ship and *in personam* against the charterer for breach of contracts of carriage. The owner joined the charterer in a proceeding in admiralty to decree exemption from or limitation of liability. Stipulation and security were substituted for the ship in the custody of the court.[2] The District Court applied the so-called "Fire Statute" to exonerate the owner entirely and the charterer and the ship in all except matters not material to the issue here. The Circuit Court of Appeals affirmed, taking a view of the statute in conflict with that of the Fifth Circuit in *The Etna Maru*, 33 F. 2d 232. To resolve the conflict we granted certiorari expressly limited to the question, "Does the Fire Statute extinguish maritime liens for cargo damage, or is its operation confined to *in personam* liability only?"[3]

The Fire Statute reads: "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."[4] The statute also provides that a charterer such as we have here stands in the position of the owner for purposes of limitation or exemption of liability.[5]

---

[2] Admiralty Rule 51.

The Alien Property Custodian on July 30, 1942, vested in himself all property in the United States of respondent Kawasaki Kisen Kabushiki Kaisha. Vesting Orders 77 and 80, 7 Federal Register 7048, 7049. On March 15, 1943, he vested in himself all property of Tokyo Marine & Fire Insurance Co. Ltd., a Japanese corporation which advanced cash collateral to the surety who became such in the *ad interim* stipulation. Vesting Order 1084, 8 Federal Register 3647.

[3] 319 U. S. 734.

[4] Act of March 3, 1851, § 1, now 46 U. S. C. § 182, formerly R. S. § 4282.

[5] Act of March 3, 1851, § 5, now 46 U. S. C. § 186.

Since "neglect of the owner" means his personal negligence, or in case of a corporate owner, negligence of its managing officers and agents as distinguished from that of the master or subordinates,[6] the findings below take the case out of the only exception provided by statute.

Apart from this inapplicable exception the immunity granted appears on its face complete. But claimants contend that because their contracts of affreightment were signed "for master" they became under maritime law ship's contracts, independently of any owners' contracts, and that the ship itself stands bound to the cargo though the owner may be freed. It seems unnecessary to examine the validity of the claim that apart from the statute claimants under the circumstances would have a lien on the vessel, or to review the historical development of the fiction that the ship for some purposes is treated as a jural personality apart from that of its owner. If we assume that the circumstances are appropriate otherwise for such a lien as claimants assert, it only brings us to the question whether the Fire Statute cuts across it as well as other doctrines of liability and extinguishes claims against the vessel as well as against the owner.

The provision here in controversy is § 1 of the Act of March 3, 1851. Despite its all but a century of existence, the contention here made has never been before this Court. Sections 3 and 4 of the same Act in other circumstances provided limitations of liability, and as to them a question was considered by this Court in *The City of Norwich,* 118 U. S. 468, 502 (1886), stated thus: "It is next contended that the act of Congress does not extend to the exoneration of the ship, but only exonerates the owners by a surrender of the ship and freight, and, therefore, that the plea of limited liability cannot be received in a pro-

---

[6] *Walker* v. *Transportation Co.,* 3 Wall. 150; *Craig* v. *Continental Ins. Co.,* 141 U. S. 638, 647; *Earle & Stoddart* v. *Ellerman's Wilson Line,* 287 U. S. 420, 424.

ceeding *in rem.*" The Court rejected the contention and held that when the owner satisfied the limited obligation fixed on him by statute, owner and vessel were both discharged. The Court said that "To say that an owner is not liable, but that his vessel is liable, seems to us like talking in riddles." The riddle after more than half a century repeated to us in different context does not appear to us to have improved with age.

In the meantime, with the exception of *The Etna Maru,* the lower federal courts have uniformly construed the statutes as exonerating the ship as well as the owner.[7] We would be reluctant to overturn an interpretation supported by such consensus of opinion among courts of admiralty, even if its justification were more doubtful than this appears.[8]

Petitioners say, however, that such of these decisions as are not distinguishable were "ill-considered." We think that the better reason as well as the weight of authority refutes petitioners. To sustain their contention would deny effect to the Fire Statute as an immunity and convert it into a limitation of liability to the value of the ship. This is what Congress did in other sections of the same Act[9] and elsewhere,[10] which suggests that it used different language here because it had a different purpose to accomplish. Congress has said that the owner shall not "answer for" this loss in question. Claimant says this means in effect that he shall answer only with his ship. But the owner would never answer for a loss except with

---

[7] *Dill* v. *The Bertram,* Fed. Cas. 3910; *Keene* v. *The Whistler,* Fed. Cas. 7645; *The Rapid Transit,* 52 F. 320; *The Salvore,* 60 F. 2d 683; *The Older,* 65 F. 2d 359; *The President Wilson,* 5 F. Supp. 684; see *Earle & Stoddart* v. *Ellerman's Wilson Line,* 287 U. S. 420, 427, n. 3; *The Buckeye State,* 39 F. Supp. 344, 346–47.

[8] See *United States* v. *Ryan,* 284 U. S. 167, 174; *Missouri* v. *Ross,* 299 U. S. 72, 75.

[9] §§ 2, 3, Act of March 3, 1851.

[10] Harter Act of February 13, 1893, 46 U. S. C. §§ 190–96.

his property, since execution against the body was not at any time in legislative contemplation. There could be no practical exoneration of the owner that did not at the same time exempt his property. If the owner by statute is told that he need not "make good" to the shipper, how may we say that he shall give up his ship for that very purpose? It seems to us that Congress has, with the exception stated in the Act, extinguished fire claims as an incident of contracts of carriage, and that no fiction as to separate personality of the ship may revive them. There may, of course, be a waiver of the benefits of the Fire Statute, but none is present in this case.

Claimants urge that the statute as construed goes beyond any other exemption from liability for negligence allowed to a common carrier, and that it should therefore be curtailed by strict construction. We think, however, that claimants' contention would result in a frustration of the purpose of the Act.

At common law the shipowner was liable as an insurer for fire damage to cargo.[11]  We may be sure that this legal policy of annexing an insurer's liability to the contract of carriage loaded the transportation rates of prudent carriers to compensate the risk. Long before Congress did so, England had separated the insurance liability from the carrier's duty.[12]  To enable our merchant marine to compete, Congress enacted this statute.[13]  It was a sharp de-

---

[11] *New Jersey Steam Navigation Co.* v. *Merchants' Bank,* 6 How. 344, 381. The Act of March 3, 1851, followed soon after and probably was enacted in consequence of this decision. See *The Great Western,* 118 U. S. 520, 533.

[12] This Court has heretofore pointed out that the Act of March 3, 1851 was patterned on English statutes, including Act of 7 George II, c. 15, passed in 1734, and 26 George III, c. 86 (1786). See *Norwich Co.* v. *Wright,* 13 Wall. 104, 117 *et seq.; The Main* v. *Williams,* 152 U. S. 122, 124.

[13] Senator Hamlin reported the bill from the Committee on Commerce on January 25, 1851 and said, "This bill is predicated on what

parture from the concepts that had usually governed the common carrier relation, but it is not to be judged as if applied to land carriage, where shipments are relatively multitudinous and small and where it might well work injustice and hardship. The change on sea transport seems less drastic in economic effects than in terms of doctrine. It enabled the carrier to compete by offering a carriage rate that paid for carriage only, without loading it for fire liability. The shipper was free to carry his own fire risk, but if he did not care to do so it was well known that those who made a business of risk-taking would issue him a separate contract of fire insurance. Congress had simply severed the insurance features from the carriage features of sea transport and left the shipper to buy each separately. While it does not often come to the surface of the record in admiralty proceedings, we are not unaware that in commercial practice the shipper who buys carriage from the shipowner usually buys fire protection from an insurance company, thus obtaining in two contracts what once might have been embodied in one. The purpose of the statute to relieve carriage rates of the insurance burden would be largely defeated if we were to adopt an interpretation which would enable cargo claimants and

---

is now the English law, and it is deemed advisable by the Committee on Commerce that the American marine should stand at home and abroad as well as the English marine." 23 Cong. Globe 332.

On February 26, 1851, speaking to the bill, Senator Hamlin said: "These are the provisions of the bill. It is true that the changes are most radical from the common law upon the subject; but they are rendered necessary, first, from the fact that the English common law system really never had an application to this country, and, second, that the English Government has changed the law, which is a very strong and established reason why we should place our commercial marine upon an equal footing with hers. Why not give to those who navigate the ocean as many inducements to do so as England has done? Why not place them upon that great theatre where we are to have the great contest for the supremacy of the commerce of the world? That is what this bill seeks to do, and it asks no more." 23 Cong. Globe 715.

256

their subrogees to shift to the ship the risk of which Congress relieved the owner. This would restore the insurance burden at least in large part to the cost of carriage and hamper the competitive opportunity it was purposed to foster by putting our law on an equal basis with that of England.

Our conclusion is that any maritime liens for claimants' cargo damage are extinguished by the Fire Statute. In so far as the decision in *The Etna Maru* conflicts, it is disapproved, and the judgment of the court below is

*Affirmed.*