350 F.Supp. 566 (1972)
Complaint of G.b.R.M.S. CALDAS as Owner of the MOTOR SHIP CALDAS, for Exoneration from and Limitation of Liability.
Civ. A. No. 43224.
United States District Court, E. D. Pennsylvania.
September 29, 1972.
*567 Richard W. Palmer, Alfred J. Kuffler, Philadelphia, Pa., for petitioner.
Robert J. Giuffra, James Simonson, New York City, John A. McMenamin, Philadelphia, Pa., for respondent.

OPINION
HUYETT, District Judge.
This is an action for exoneration of the Motor Ship CALDAS under the Fire Statute of the United States, 46 U.S.C. § 182, and for limitation of damages under 46 U.S.C. § 183. The action arises out of a fire on board the CALDAS on February 27, 1967, which resulted in damage to cargo and belongings. Various actions were brought against the shipowner but these were enjoined from proceeding when the shipowner brought the present action in accordance with 46 U.S.C. § 185. The issue of liability only has been tried by the Court.

FINDINGS OF FACT
1. This is a maritime cause of action within the meaning of Fed.R.Civ.P. 9(h).
2. Petitioner G.b.R.M.S. CALDAS is now and was at all times hereinafter mentioned a limited German business company having its principal office and *568 place of business at Hamburg, Germany and was at all material times herein the owner of the motor ship CALDAS.
3. The petitioner is within the jurisdiction of this Court and has goods, chattels and credits within the jurisdiction of this Court.
4. Claimant Anderson Clayton & Company is a Delaware corporation with its principal place of business in New York City.
5. Claimant Leon Israel Brothers Company is a partnership organized and existing under the laws of the State of New York.
6. Claimant Rockefeller Foundation is a non-profit organization with its principal place of business in New York City.
7. Claimant Luis F. Sanchez is a citizen of Colombia.
8. At all material times, Panawaco, Inc. was time charterer of the CALDAS and charterer issued all bills of lading.
9. At the opening of trial, Coldemar Line, Coldemar Agencies, and Panawaco, Inc. stipulated that their claims against petitioner had been settled and as between them and petitioner no further issues remained to be litigated.
10. The issue of damages has been severed from that of liability by Order of the Court dated December 13, 1971.
11. The motor ship CALDAS was a steel vessel built in 1953 at Hamburg, Germany with the following registered dimensions:
Length 259'4"; beam 41'5"; depth 17'3¾"; gross tonnage 1,047. Her home port was Hamburg, Federal Republic of West Germany and she was propelled by a 1500 brake horsepower engine.
12. The CALDAS, a German flag vessel, was required to comply with the regulations of Germanischer Lloyd, a recognized classification society, Seeberuftsgenossenschaft (Bureau of Safety and Fire Equipment, hereinafter SBG), and the applicable Safety of Life at Sea Convention (SOLAS).
13. The CALDAS was classed by Germanischer Lloyd, a society established under German law to supervise the standards of design, construction and maintenance of German flag vessels, and her safety and fire fighting equipment was regularly surveyed by SBG every two years.
14. The vessel had last undergone an SBG hull and machinery survey in July of 1965 and as a result of the survey, on the recommendation of Germanischer Lloyd, technical adviser to SBG, a sailing permit and safety equipment certificate, valid until June, 1967, were issued to the CALDAS.
15. In July of 1966 the CALDAS underwent her last classification hull and machinery survey prior to the fire, and all fire fighting equipment was certified and approved.
16. At the end of each voyage the Master was required to submit a voyage report which contained details of the ship's working during the voyage together with a list of each certificate which the vessel was required to have, together with the expiration date of that certificate.
17. Upon hiring Karl Sefranek as Master the marine superintendent for owners, Mr. Herbert Feindt, conferred with him and instructed him concerning company procedures prior to assigning him a command. They continued to confer from time to time.
18. When a vessel of the owners called at a European port, an inspector from the marine superintendent's office came on board to see to the vessel's needs and to determine whether or not company procedures were being followed.
19. The keel of the CALDAS was laid on December 3, 1952 in accordance with the Safety of Life at Sea Convention of 1948 (hereinafter SOLAS 48), as required by domestic law of West Germany. Prior to construction the plans for the vessel were approved by Germanischer Lloyd and SBG and the vessel was built according to the plans.
*569 20. Under the terms of Safety of Life at Sea Convention of 1960 (hereinafter SOLAS 60), which came into effect on May 26, 1965, CALDAS was an "existing vessel" which did not have to comply with the terms of the treaty, and therefore no changes in her design or construction were required by the treaty.
21. The rules of Germanischer Lloyd, SBG and SOLAS 48 together required that the ship's fire fighting equipment include two pumps, sufficient hydrants and hoses so that each part of the ship could be reached by two jets of water, five extinguishers in the crew accommodations, one extinguisher in the radio room, seven extinguishers in the engine room, three extinguishers, a forty-five liter extinguisher, and one smoke mask.
22. At all material times, the CALDAS was equipped with the following required fire fighting equipment: twelve hydrants; five twenty-meter hoses on deck and two fifteen-meter hoses in the engine room; six foam extinguishers, one carbon dioxide extinguisher, one portable forty-five liter extinguisher, a smoke mask, a safety lamp and an axe in the deck department; and six carbon dioxide extinguishers, five foam extinguishers and two fire pumps in the engine department.
23. The vessel was equipped with adequate hoses to get two jets of water into any part of the ship. Placement of hoses and hydrants had been approved by Germanischer Lloyd and SBG. The fire hoses were, at all material times, in good condition and had been tested within two months of the fire. All hoses were properly stowed in positions readily accessible to the hydrants. Fire extinguishers, which had been tested within six months of the fire were stowed as indicated in the SBG surveys in July 1965.
24. It was proper under German law at the time of this fire for the CALDAS to sail with only two mates.
25. Watch, quarter and station bills indicating each man's duty for both fire and boat drills were posted on the bridge and on each deck; there was also a yellow duty card on each man's bunk stating his station in the event of fire and boat drills.
26. Prior to the fire, drills were held on the vessel at least once each calendar month as required by SBG rules. The last fire drill before the fire was held during the first week of January, 1967.
27. The SBG survey of June, 1965, provided to owners, indicated that the logbook of the CALDAS recorded monthly fire drills in accordance with SBG regulations. The owners had no reason to believe that this procedure was not being followed.
28. During each fire drill the crew was questioned about their duties during a fire, they reported to their stations, unreeled hoses, connected them to hydrants and attempted to use them.
29. In February, 1967, the M/V CALDAS loaded bags of coffee in apparent good order and condition at Buenaventura, Colombia for transportation to New York.
30. On February 11, 1967 in Cartagena, Colombia, the vessel signed on Pablo Meijo as a crew member. He had previously served on the CALDAS and had performed his work satisfactorily.
31. On February 20, 1967, Meijo failed to appear for his watch and refused to answer when questioned by ship's officers. He was relieved of his duties and when the vessel docked at Jacksonville the Master ordered that he be taken to a doctor for examination.
32. As a result of arrangements made by charterer's agents, Dr. Anson Mellion saw Meijo on February 24 and diagnosed his condition as mental depression. He advised that Pablo be given rest, kept in his cabin, and deprived of all sharp objects which could be used for self-destruction.
33. Government officials in Jacksonville would not permit the CALDAS to disembark Meijo for repatriation and it was necessary for the ship to take him *570 to New York for possible re-examination and repatriation.
34. In accordance with Dr. Mellion's recommendations, Meijo was relieved of all duties and was kept in his cabin under guard.
35. There was no reason to anticipate that Meijo might attempt suicide by setting a fire.
36. Shortly before 12:40 P.M. on February 26, 1967, fire was discovered on the upper bunk and along the interior bulkhead of Meijo's cabin. Meijo was immediately let out of his cabin and was never seen again.
37. No one who testified saw how the fire started.
38. Members of the crew immediately attempted to extinguish the fire but without success.
39. Upon discovery of the fire the officer of the watch promptly sounded the fire alarm and the crew reported to their fire stations.
40. The Master immediately went to the bridge from his cabin and reviewed the situation. He ordered left rudder to place the wind on the port side and blow the smoke away from the house. An order was given to send an SOS within a few minutes of the alarm. The Master then ordered that the engines be stopped. At the time the SOS was given the Master believed that it was impossible to save the ship.
41. Attempts were made to fight the fire in the passageways, but the smoke was so intense that it was impossible to enter the house.
42. Members of the crew rigged a scaffold which was lowered over the side of the ship alongside Meijo's cabin. The bosun descended onto the scaffold, broke the porthole window to the cabin and put a rubber washdown hose into the cabin. Water came from the hose under normal pressure in a stream sufficient to reach all parts of the cabin. The bosun could see no flame in the cabin. He left the scaffold after approximately five minutes but left the hose in the porthole and the water continued to run. The use of a rubber washdown hose creates less friction than an unlined fire hose and was properly used.
43. The bosun entered the Master's cabin through a window because the passageway was impassable in order to retrieve some papers. He also entered the Chief Engineer's cabin to get papers, but was unable to enter the Chief Officer's cabin which was in flames.
44. An old fire hose was obtained from the chain locker and a spare nozzle from the bosun's storeroom in the mast-house between hatches 1 and 2. The hose was attached to the hydrant on the port side of the house at the boat deck level and put into the companionway. It was then taken out of the companionway, the nozzle removed and the hose was left on the deck so that the water would cool the deck which was immediately above a fuel tank which it was feared would explode.
45. The fire on the CALDAS spread very rapidly and no means of fighting the fire could have prevented its spread.
46. The cause of the fire could not be determined.
47. The steps taken by the crew under the circumstances were reasonable.
48. Orders were given to make ready the port lifeboat after smoke prevented crewmembers from getting to the starboard lifeboat. The order to abandon ship was given at about 1:20 P.M. at which time the wood grating covering the steel plate of the deck was burning, the interior of the boat deck was in flames and the wheelhouse was filled with smoke. The Master, Chief Engineer, Chief Officer and bosun remained on board in the forward portion of the ship, but they were forced to abandon ship at about 4:20 P.M.
49. Crewmembers were taken aboard the SOMERSET TRADER and the ATLANTIC HERITAGE, vessels which had responded to the SOS, and were brought to Philadelphia. The CALDAS was also attended by Coast Guard vessels, which later extinguished the fire.
*571 50. The vessel was then taken in tow by the Coast Guard and brought into Delaware Bay where she was delivered to the Salvage master.
51. The vessel was then towed to Sun Shipbuilding Dry Dock Company (Sun), Chester, Pa., arriving on March 3, 1967.
52. It was reasonable for owners of the CALDAS to have the vessel towed to Sun for survey, inspection and determination of costs of repairs.
53. Discharge of the coffee required mobile cranes and covered enclosed storage sheds. The vessel had no operable cargo gear. Sun had no inside or outside storage facilities and the normal operations of the shipyard would interfere with proper segregation and discharge. There was a serious question as to whether the shipyard could furnish electrical current to the vessel for unloading. Sun also advised the vessel interests that the proposed discharge of cargo at the shipyard would precipitate a labor dispute involving Sun and the longshoreman's union.
54. Vessel interests made all reasonable efforts to discharge the cargo at the Sun shipyards.
55. Chester Marine Terminal could not be used for discharge because there were no closed, covered sheds necessary for storing coffee.
56. Camden Marine Terminal was unavailable until at least April 1, 1967, and there was no guarantee that space would be available even then.
57. It was reasonable to leave the ship at Sun during this time.
58. While the ship was at Sun shipyard the hold was ventilated by leaving the hatches opened as recommended by the cargo surveyor. This lessened the effect of the smoke damage.
59. All the damage to the coffee cargo resulted from the fire, but most of the damage was caused by smoke and comparatively few bags were damaged by water.
60. Due to difficulties existing at the Sun shipyard it was impossible for the coffee salvor retained to work the wet coffee to do so.
61. Wilmington Marine Terminal agreed to take the CALDAS and on April 4, 1967 the ship was towed to Wilmington. Discharge of the cargo began on April 5 and was completed on April 7.
62. Mr. James L. Wiley, cargo surveyor for the cargo interests, did not go aboard the ship until April 5, 1967 and he did not examine the coffee until it had been discharged on April 7, 1967. He was not able to compare the condition of the coffee at that time with its condition on arrival at Sun shipyard.
63. Steps taken to prevent aggravation of damage to the coffee were reasonable under all the circumstances.
64. There was no aggravation of the damage to the coffee between March 3 and April 5, 1967 as a result of delay in discharging the cargo.
65. The parties agreed in April, 1967 that the expenses of towage from Chester to Wilmington Marine Terminal, the total cost of discharging the cargo, including, but not limited to, stevedores, clerks, checkers, etc., and the cost of storing the cargo after discharge for a reasonable period of time would be allowed in general average as general average expenses without prejudicing the right of cargo interests to contest vessel owner's right to general average contributions.
66. The vessel owner and the charterers each advanced 50% of the cost of towage, discharge expenses and reasonable storage charges without prejudice to any rights against each other or cargo interests.
67. The agreement concerning general average expenses did not prejudice cargo's rights to claim against the vessel owner for all losses and damage sustained by cargo, nor did it prejudice rights of vessel owner as to any statutory defense under applicable law which might be available to the vessel owner.
68. The Jason Clause was applicable to the bills of lading and provides that *572 in the event of accident, damage, disaster or danger before or after commencement of the voyage for which the carrier is not responsible by statute, contract or otherwise, the owners of the goods shall contribute in general average to the payment of losses, sacrifices or expenses of a general average nature.
69. The owner of the vessel is expressly made the beneficiary of the Jason Clause since the word "carrier" was defined to include the ship and its owner.
70. All general average outstanding is payable to the owner since charterer's claim was previously settled.

DISCUSSION
The present action arises out of a fire on board the G.b.R.M.S. CALDAS on February 27, 1967, which resulted in extensive damage to coffee cargo. Vessel owner (Petitioner) has filed a petition with this court seeking exoneration from liability for such damage under the Fire Statute, 46 U.S.C. § 182;[1] or limitation of liability to the value of the ship owner's interest in the vessel and the freight under 46 U.S.C. § 183(a).[2] Petitioner also seeks a contribution in General Average from the cargo interests (Claimants). Claimants deny that petitioner has a right to either exoneration or limitation under § 182 or § 183.
The two statutes offer broad protection to vessel owners if cargo is lost or damaged while on board their ship. The Fire Statute, § 182, exonerates a vessel owner from liability for loss of cargo due to fire "unless such fire is caused by the design or neglect of such owner."[3] Limitation under § 183 is permitted for damage to or loss of cargo due to a very wide range of causes if the damage or loss is incurred without the knowledge or privity of the vessel owner. We shall treat the requirements of "design or neglect" and "privity or knowledge" as being essentially identical. See G. Gilmore and C. Black, The Law of Admiralty 697-698 (1957).
The burden of proof in an action seeking exoneration or limitation is divided. See G. Gilmore and C. Black, The Law of Admiralty 705 (1957). Claimant must prove that the destruction or loss was proximately caused by negligence on the vessel. Walston v. Lambertsen, 349 F.2d 660 (9 Cir. 1965), cert. den. 382 U.S. 980, 86 S.Ct. 553, 15 L.Ed.2d 470 (1966); Holloway Concrete Products Co. v. Beltz-Beatty, Inc., 293 F.2d 474 (5 Cir. 1961). Once negligence has been shown to be the cause, the burden shifts to the shipowner to demonstrate that he comes within the statutory exemption because there was no "design or neglect" or "privity or knowledge" on his part. Coryell v. Phipps, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363 (1943); Verbeeck v. Black Diamond Steamship Corp., 269 F.2d 68 (2 Cir. 1959), cert. den. Skibs A/S Jolund v. *573 American Smelting, etc., 361 U.S. 934, 80 S.Ct. 374, 4 L.Ed.2d 355 (1960).
A shipowner is entitled to exoneration or limitation unless there is personal privity or knowledge of the shipowner, or, in the case of a corporate owner, of the managing officers or agents. The negligence of the master, chief engineer, ship's officers or seamen does not deprive an owner of the statute's protection. See Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30 (1943); Earle & Stoddart, Inc. v. Ellerman's Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 (1932); G. Gilmore and C. Black, the Law of Admiralty 698 (1957).
Claimants contend that the fire was set by Pablo Meijo, a seaman, and was the direct result of the ship's negligence. The claim that Meijo set the fire is based on the facts that it was first observed in his cabin and that the seaman was depressed and had shortly before attempted or threatened suicide. Claimants assert that the fire resulted from negligence because Meijo should have been put off the ship in Jacksonville after his examination by Dr. Anson Mellion, and, also, that the ship did not take all proper precautions while he was on board in that he had matches.
We do not find that claimants have satisfied the burden of proving that Meijo set the fire. There is little direct evidence aside from the fact that the fire was first observed in his cabin. Other circumstantial evidence, such as Dr. Mellion's advice to take away all items of self-destruction, Meijo's threat to commit suicide and the possibility that he had matches, allow claimants to construct a theory which is plausible. Nevertheless, the cause of the fire remains only speculative on the basis of such evidence. Captain Burke testified that it was not possible to determine the cause of the fire. The only established fact, discovery in his cabin, is not sufficient to permit us to conclude that Meijo was responsible. The Fire Statute prevents recovery by cargo owners when the origin of the fire is a matter of speculation. See Connell Bros. Co. v. Sevenseas Trading and Steamship Co., 111 F.Supp. 227 (N.D.Cal.1953).
Claimants also contend that the fire fighting on the CALDAS was negligent and grossly inadequate. They assert that the crew failed to follow elementary procedures, such as closing doors to cut off oxygen and using proper equipment to fight the fire. It is not necessary to consider whether claimants accusation of negligent fire fighting is correct because such negligence cannot be imputed to the shipowner.
It is clear, as discussed above, that shipowners do not lose the protection of the Fire Statute or § 183 because of the negligence of the ship's officers or the crew. It is only if the negligence which results in the loss of the material can be personally attributed to the owner or to agents with broad responsibility in the corporate organization that the protection provided by these statutes will be denied. In the present case reasonable steps were taken prior to the fire to properly train the crew to fight fires on board.
The evidence indicated that the ship had sufficient fire drills to properly train the crew in their responsibilities. SBG rules, which governed the CALDAS as a ship of German registry, required that fire drills be held during every calendar month. Officers of the CALDAS testified that a fire drill had been held during the first week of January, although they could not produce a record of it since the log book for that period was lost in the fire. The First Officer, Gustav Dietrich, who was in charge of fire fighting, testified that a fire drill was scheduled when they arrived in New York on February 28.
The Second Officer, Alexander Zillian, testified in deposition that a fire drill involved the entire crew, which assembled on the bridge. The smoke mask was tested and crew members were questioned concerning their duties during a *574 fire. General instructions were given concerning operations in a fire. There was also testimony that the hoses and fire extinguishers were tested at least during some of the drills. In addition to the fire drills there were yellow duty cards on each man's cabin stating stations in case of fire, and watch, quarter, and station bills indicating each man's duty during a fire were posted in various locations. Captain Burke testified that the fire drills and training were reasonable and we agree.
The fact that the owner of the CALDAS did not require a report concerning fire drills is immaterial. The drills were reasonable. The report filed by SBG for the purpose of certification indicated that in June, 1965, the log books of CALDAS showed that monthly fire drills had been carried out. The officers hired to man the CALDAS all had received substantial fire fighting training during their own training as seamen. They were told by agents of the corporation that they were required to abide by the applicable regulations and they were aware of the requirement of monthly fire drills. We believe that the corporate owner of CALDAS reasonably carried out its responsibility for proper fire fighting training for the crew.
Claimants last contention is that the CALDAS was not properly outfitted for fire fighting. They rely upon some contradictory testimony of crew members, and the failure to use some equipment which was supposedly on the ship.
The CALDAS was required by SBG and SOLAS to have certain types of fire fighting equipment on board. The failure to satisfy a statutory requirement does not deprive an owner of the protection of these statutes. It is still necessary for the claimants to prove that negligence caused the loss by fire. Automobile Ins. Co. of Hartford, Conn. v. United Fruit Co., 224 F.2d 72 (2 Cir. 1955), cert. den. 350 U.S. 885, 76 S.Ct. 138, 100 L.Ed. 780 (1955); Fidelity-Phenix Fire Ins. Co. of New York v. Flota Mercante Del Estado, 205 F.2d 886 (5 Cir. 1953), cert. den. 346 U.S. 915, 74 S.Ct. 275, 98 L.Ed. 411 (1953). In order for claimants to prevail, therefore, it was necessary that they prove that the losses were caused by a lack of hoses or their improper placement.
Petitioner presented an expert witness, Captain Burke, who testified that it was his opinion that the fire in the CALDAS spread very rapidly. He said that a professional fire department would have been hard pressed to extinguish the blaze after the first very few minutes. There was evidence in the record to support this view such as the rapidity with which the smoke and heat made entrance into the house impossible. On the other hand, the claimants who had the burden of proof in this matter, failed to produce testimony on this point. Without some evidence, beyond speculation that with proper equipment the fire might have been put out we cannot say that claimants have carried their burden of proof. An example of their failure on this point is the assertion that it was negligence for Peterburs to use the rubber washdown hose to attempt to put the fire out. Captain Burke testified that such a hose was proper and could be effective due to its high efficiency. Claimants presented no testimony to counter this but relied upon regulations. The lack of expert testimony on the part of claimants is very harmful to their attempt to prove causal effect in the face of Captain Burke's testimony for petitioners. We believe it is fatal. While claimants have plainly raised significant questions, they are not enough to prove that any negligence of this type caused or contributed to the losses.
The evidence produced at trial and in deposition gave considerable support to petitioner's contention that the fire equipment was properly placed throughout the ship. Several surveys taken within the two years prior to the fire indicated that the vessel was equipped in accordance with SBG and SOLAS standards. Testimony of several crew members indicated that the same equipment was available at the time of the fire. In *575 itself this is not proof that there was no negligence which caused the accident, but the burden is on claimants to prove the opposite, which has not been done.
We conclude from the evidence presented at trial, which came for the most part from petitioner, that petitioner should be exonerated under the Fire Statute.
This determination leads us to the issue of general average expenses. After the fire, an agreement was entered into by the various parties in this action that the expenses of towage from Chester to Wilmington, discharge of the cargo and storage for a reasonable time would be allowed in general average as general average expenses. It was added that this did not prejudice the right of cargo interests to contest the vessel owner's right to obtain general average contribution.
The vessel owner's right to general average contribution is governed by the "Jason Clause" in the bill of lading. It requires contribution by cargo interests when "the Carrier is not responsible by statute or contract or otherwise" for an "accident, danger, damage or disaster". In the present case, after contest by the cargo interests, the shipowner has been exonerated under the Fire Statute and the cargo interests must be held liable for general average contribution.
Claimants, however, also assert that the shipowner was responsible for aggravation of the damage to the coffee while the ship was berthed at Sun Shipyard in Chester, Pa. They argued that the surveyor for the ship's owner did not make sufficient effort to get the ship to a berth where it could be quickly unloaded. The testimony of shipowner's surveyor, Mr. Worman, however, indicated that constant effort was made throughout March to obtain a suitable docking area. This was not adequately challenged by Mr. Wiley, claimant's surveyor, who indicated he was unaware of much that occurred during March.
Claimants also urge a finding that the damage to the coffee from smoke was aggravated by the failure of the shipowner to properly care for the cargo while the ship was at Sun Shipyard. Mr. Wiley testified that the cargo areas were improperly ventilated and that the condition of the coffee worsened during the month it sat in the holds.
Mr. Worman, who was concerned with the entire process of salvaging the cargo, testified that everything possible was done to maintain and improve the condition of the coffee while it was awaiting unloading. He gave several good, uncontroverted reasons why the coffee could not be unloaded prior to arriving at Wilmington, such as the lack of covered storage space. He testified that the holds were ventilated by leaving them open to the air as much as possible. It was his conclusion that the condition of the smoke damaged coffee had improved by the time of discharge on April 4 in Wilmington. Mr. Wiley, who had not examined the coffee prior to April 7, could not make any comparison with its condition on March 3 when the ship arrived at Sun Shipyard. We find that there was no aggravation to the cargo damage for which petitioner is liable.
The present action for exoneration and limitation was instituted after other actions were filed by claimants against petitioner for damages arising out of the same events. Those actions were enjoined in accordance with 46 U. S.C. § 185 after this proceeding began. The purpose of § 185 is to permit all actions to be consolidated in one action which will dispose of all claims. See The Quarrington Court, 102 F.2d 916 (2 Cir.), cert. den. Court Line v. Isthmian, 307 U.S. 645, 59 S.Ct. 1043, 83 L.Ed. 1525 (1939). In this case the decision that the petitioner is exonerated under the Fire Statute disposes of the claims in the other suits.
Charterers, Panawaco, Inc., claim that a decision in favor of petitioner *576 is dispositive of any claims by cargo interests against it. Claimants assert that the charterer is not properly before the Court and claims against it cannot be decided. Charterer has not established that it comes within the provisions of 46 U.S.C. § 186,[4] permitting it to receive the same treatment as the shipowner in an exoneration and limitation proceeding. See G. Gilmore & C. Black, The Law of Admiralty 673 (1957). Charterer had not filed any answer in this Court prior to the conclusion of trial and we are not satisfied that charterer is properly before us.

CONCLUSIONS OF LAW
1. This Court has jurisdiction of the parties and the subject matter of the action.
2. The owners of the CALDAS are free of any design, neglect or privity in connection with the fire on board that vessel on February 27, 1967 and the CALDAS was seaworthy at all material times.
3. The fire on the CALDAS occurred without the design, neglect or privity of her owners, directors or managing agents.
4. The officers and crew of the CALDAS were regularly drilled and well trained and the fire started without the negligence of any of them.
5. Cargo claimants have failed to prove that the fire was started by any cause for which owners, directors or managing agents of the CALDAS could be chargeable.
6. The Anderson Clayton interests and Leon Israel interests are liable for their total General Average contributions, with interest, arising from the fire, port of refuge and forced discharge expenses.
7. There was no aggravation of the damage to cargo as a result of the cargo remaining in the vessel from March 2 until April 5.
8. The cargo was discharged from the vessel with reasonable speed in all the circumstances.
9. Petitioner is entitled to exoneration from all liability, with costs.
10. All cargo claims subject of Civil Action No. 42243 should be dismissed with costs as they relate to petitioner. The claim of Luis Sanchez should be dismissed.
11. Leon Israel and Anderson Clayton should be held liable for all general average expenses identified in the General Average Statement (P-48), the amount of such liability shall be determined at a hearing on damages, if the parties are unable to agree thereon within ninety (90) days from the date of the entry of judgment herein, with costs and interest from the date of fire.
NOTES
[1] "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner." 46 U.S.C. § 182.
[2] "The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." 46 U.S.C. § 183(a).
[3] This provision for exoneration is essentially the same as the provision in the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(2):

"Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from . . .
(b) Fire, unless caused by the actual fault or privity of the carrier . . ."
[4] "The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels; and such vessel, when so chartered, shall be liable in the same manner as if navigated by the owner thereof." 46 U.S.C. § 186.