UNION OIL COMPANY OF CALIFOR-
NIA, Mobil Producing Texas & New
Mexico, Inc. and Diamond Shamrock
Corporation, Plaintiffs-Appellees,

v.

M/V POINT DOVER, her engines,
tackle, appurtenances, etc., in
rem, Defendant,

and

Point Marine, Inc., her owner and
operator, in personam,
Defendant-Appellant.

No. 84–2016.

United States Court of Appeals,
Fifth Circuit.

April 11, 1985.

Deutsch, Kerrigan & Stiles, G. Alex Weller, Cornelius G. Van Dalen, New Orleans, La., for defendant-appellant.

Julian & Seele, Robert M. Julian, Glenn Legge, Houston, Tex., for plaintiffs-appellees.

Before BROWN, WILLIAMS, and GARWOOD, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Point Marine, Inc., the owner and operator of M/V POINT DOVER attacks the district court's judgment imputing on accepted principles the negligence of the vessel's Master to the vessel owner under the theory of *respondeat superior* so as to make Point Marine liable for damage to Union's undersea pipeline. How the application of such accepted principles could arrest the attention of this busy court takes a little doing. It comes about because the time charter between Point Marine and Union provides that the vessel owner shall not be responsible for loss or damage to charterer's property unless caused by the "actual fault or privity of the owner." We agree with Point Marine that the use of this time-honored, carbuncle-encrusted, saltwater phrase makes the usual motion of *respondeat superior* inapplicable under the terms of this charter party and reverse.

### Anchors Aweigh

Union Oil Company of California (Union) is part owner of an undersea pipeline connected to a fixed platform off the coast of Texas at High Island Block A–443. Union time chartered the M/V POINT DOVER from Point Marine, Inc. to transport supplies to several drilling platforms in the Gulf of Mexico. Union received a permit to construct a subsea pipeline approximately 16.7 miles in length in the Gulf of Mexico. The pipe was welded on land and in September, 1980, set in place on the sea bottom. The pipeline remained on the sea floor awaiting burial at a minimum depth of three feet before actual oil flow operations could begin. The pipeline extended from the platform in a southwesterly direction.

The POINT DOVER approached the platform early in the morning of November 28, 1980 (approximately 4 a.m.).[1] Because of

---

1. Apparently it was still dark and a hard wind was blowing from the northwest. The seas were from the northwest at seven to eight feet in height.

the weather the POINT DOVER was unable to tie up safely to the platform.

The trial court determined that POINT DOVER's Master, Gary Williams, knew that there was a pipeline somewhere in the area connected to the platform although he had no precise knowledge of its location. The Master radioed to the personnel on the platform and was informed that it was safe to anchor to the northwest of the platform. Unfortunately, the Master of POINT DOVER became disoriented and dropped anchor south of the rig. That afternoon the weather cleared and the vessel made her delivery to the platform. The Master then ordered a crewman, Billy Pace, to weigh anchor. The trial court found that as the anchor was coming up crew members heard the grinding of the winch which indicated that the anchor was stuck on a heavy object. Apparently, the crew continued to draw up the anchor for five to ten minutes and during this time they discussed the laboring sound of the winch motor. When the anchor surfaced, Union's pipeline was caught in the flukes and the Master ordered the anchor line cut.

The trial court concluded—and the vessel owner does not dispute—that the crew's failure to attempt an earlier "free fall" of the anchor when there was first notice of the snag constituted negligence which proximately caused Union's damages. The trial court—in what is either a non-sequitur or an absence of supporting reason—further determined that although the time charter provides that the vessel owner shall not be responsible for loss or damage arising without the "actual fault or privity of the owner," privity of shoreside management was not a prerequisite to liability in this case since the actual fault of the vessel's Master was established. Essentially, the trial court applied the principle of *respondeat superior* to impose liability on Point Marine.

### Actual Fault or Privity

As though the scrivener had the very first edition of Benedict at his side, the time charter contained the following liability provision:

> Neither the vessel nor OWNER shall be responsible for any loss or damage however arising or resulting, unless caused *by want of due diligence on the part of OWNER to make the vessel seaworthy* or have it properly manned, equipped, and supplied at the inception of the voyage, or from any cause whatsoever *arising without the actual fault or privity of OWNER.* (emphasis supplied).

Point Marine argues that the trial court erroneously concluded that the vessel owner would be liable on the imputed, admitted, Master's negligence under the usual principle of *respondeat superior.* Rather, it contends the phrase "actual fault or privity" should be interpreted and applied in light of the usual meaning attributed to the phrase in the vast body of maritime law including its use in the Limitation of Liability Act, 46 U.S.C. § 183(a), the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(2)(b), and the Fire Statute, 46 U.S.C. § 182. We agree and reverse.

In *Continental Insurance Co. v. Sabine Towing Co.,* 117 F.2d 694, 1941 A.M.C. 262 (5th Cir.), *cert. denied,* 313 U.S. 588, 61 S.Ct. 1111, 85 L.Ed. 1543, 1941 A.M.C. 1010 (1941), we dealt with a similar phrase in a marine insurance policy. The *Continental Insurance* policy provided in part:

> This company hereby undertakes to make good to the Assured or the Assured's executors, administrators and/or assigns, all such loss and/or expenses as the Assured shall, *without fault or privity* on the party of the Assured, become liable to pay and shall pay, not exceeding the amount of this policy on account of the liabilities, risks, events, happenings and/or occurrences herein set forth.

*Continental,* 117 F.2d at 700 n. 12, 1941 A.M.C. at 270 n. 12 (emphasis supplied). Sabine Towing contended, and in that case the district court agreed, that the phrase "without fault or privity" should be applied only in connection with willful or intentional acts on the part of the assured. We disagreed and determined that "without

fault or privity" should be given the same meaning and effect as used in the American[2] and English statutes[3]. In reaching this decision we reasoned that Sabine's offer of oral testimony concerning the underwriters' meaning and effect of the words used was inadmissible since this phrase as used in insurance policies or other maritime contracts has a plain and settled meaning in popular and legal usage.[4]

In *Larsen v. Insurance Co. of North America*, 362 F.2d 261 (9th Cir.1966), the Ninth Circuit determined that the phrase "navigation and/or management of the vessel" in an Inchmaree clause[5] in a marine insurance policy should be given the same construction as is given under the Harter Act,[6] 46 U.S.C. § 192 and COGSA,[7] 46 U.S.C. § 1304(2)(a). It was argued in that case that the special purpose of the Harter Act and COGSA rendered a similar construction of the phrase in the insurance policy inappropriate. The Ninth Circuit disagreed.

The analysis of *Continental* and *Larsen* applies with equal force to give us ample basis for independently reaching a like result here. The phrase "actual fault or privity" in the lore and the law of the sea has a settled meaning as do the familiar terms bo's'n or fo'c's'le head. *Cf. Empire Seafood, Inc. v. Anderson*, 398 F.2d 204, 210 n. 4, 1968 A.M.C. 2664, 2671 n. 4 (5th Cir.), *cert. denied*, 393 U.S. 983, 89 S.Ct. 449, 21 L.Ed.2d 444 (1968). The construction which Union seeks, would repudiate over a century of legal writing and salty literature.

As a part of the accepted jargon of those who do not necessarily go down to sea in ships but spend their lifetimes in legal writing about the calling, we would point out that this phrase is not unique to this charter party. It appears in the Genvoy,[8] gen-

---

**2.** Limitation Act, 46 U.S.C. § 183(a).

**3.** The English Statutes to which we referred were: Statute of George II, 1734, Eng.Adm.Stat. 167, Statute 26, George III, 1786; Statute 53, George III, 1813; Statutes 18 and 19, Victoria; 502 Merchant Shipping Act, 1894, 57 and 58 Victoria, Chapter 60; Marine Insurance Act, 1906, Edward VII, Chapter 41.

**4.** We stated in *Continental* that even if the oral testimony were considered admissible it would not help Sabine since the testimony did not show a uniform business or trade usage of the words different from their accepted usage and ordinary meaning in maritime matters. *Continental*, 117 F.2d at 697, 1941 A.M.C. at 266.

**5.** This insurance is also specially to cover any loss of or damage to the interest insured hereunder, through the bursting of boilers, breakage of shafts or through any latent defect in the machinery, hull or appurtenances, or from faults or errors in the navigation and/or management of the vessel by the Master, mariners, mates, engineers, or pilots.
*Larsen*, 362 F.2d at 262.

**6.** § 192. **Limitation of liability for errors of navigation, dangers of the sea and acts of God.**
If the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel in all respects seaworthy and properly manned, equipped, and supplied, neither the vessel, her owner or owners, agent, or charterers, shall

become or be held responsible for damage or loss resulting from *faults or errors in navigation or in the management of said vessel* nor shall the vessel, her owner or owners, charterers, agent, or master be held liable for losses arising from dangers of the sea or other navigable waters, acts of God, or public enemies, or the inherent defect, quality, or vice of the thing carried, or from insufficiency of package, *or seizure under legal process, or for loss* resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service. (Emphasis supplied)

**7.** § 1304. **Rights and immunities of carrier ship.**
\* \* \* \* \* \*
**Uncontrollable causes of loss**
(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—
(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier *in the navigation or in the management of the ship;* (Emphasis supplied)
\* \* \* \* \* \*

**8.** The GENVOY charter party provides in part:
32. Owners Responsibility Clause. Owners shall, before and at the beginning of the voyage, exercise due diligence to make the vessel seaworthy and properly manned, equipped and supplied, and to make the holds

eral purpose charter party and the Nippon-voy[9] 1963 voyage charter party. *See* 2B Benedict, Admiralty, 7th Ed. (1984).

We would add that actual fault or privity is not the only time-worn, war-weary maritime term of art used in this charter party. That same clause contains the phrase "due diligence."[10] The general maritime law reads into every charter a warranty of seaworthiness. *The CALEDONIA,* 157 U.S. 124, 130, 15 S.Ct. 537, 540, 39 L.Ed. 644, 646 (1895). This warranty is absolute and does not depend upon the knowledge of the owner or diligence to provide a seawor-

and all other parts of the vessel in which cargo is carried, fit and safe for its reception, carriage and preservation. Owners shall properly and carefully handle, carry, keep and care for the cargo. Unless elsewhere in this charter party it is provided that the loading, stowage and/or discharge of the vessel is to be at Charterers' risk and expense, Owners shall properly and carefully load, stow and discharge the cargo.

*Neither Owners nor the vessel shall be liable for loss of* or damage to the cargo arising or resulting from: unseaworthiness, unless caused by want of due diligence on the part of Owners to make the vessel seaworthy, and to secure that the vessel is properly manned, equipped and supplied, and to make the holds and all other parts of the vessel in which cargo is carried, fit and safe for its reception, carriage and preservation; act, neglect or default of the master, mariner, pilot, or the servants of the Owners in the navigation or in the management of the vessel; fire, unless caused by the actual fault or privity of the Owners; perils, dangers and accidents of the sea or other navigable waters; act of God; act of war; act of public enemies, arrest or restraint of princes, rulers or people, or seizure under legal process; quarantine restrictions; act or omissions of Charterers or of the shippers or owners of the goods, their agents or representatives; strikes or lockouts or stoppage or restraint of labor from whatever cause, whether partial or general (provided, that nothing herein contained shall be construed to relieve Owners from responsibility for their own acts); riots and civil commotion; saving or attempting to save life or property at sea; wastage in bulk or weight or any other loss or damage arising from inherent defect, quality or vice of the goods; insufficiency of packing; insufficiency or inadequacy of marks; latent defects not discoverable by due diligence; *any other cause arising without the actual fault or privity of the Owners or without the fault of the agents or servants of the Owners,* but the burden of proof shall be on the Owners or other person claiming the benefit of this exception to show that neither the actual fault or privity of the Owners nor the fault or neglect of the agents or servants of the Owners contributed to the loss or damage.

(Emphasis supplied)

9. The NIPPONVOY charter party provides in part:

12. Owners' Responsibility and Exemption. Owners shall, before and at the beginning of the voyage, exercise due diligence to make the vessel seaworthy and properly manned, equipped and supplied and to make the holds and all other parts of the vessel in which cargo is carried fit and safe for its reception, carriage and preservation. Owners shall properly and carefully handle, carry, keep and care for the cargo.

*Owners shall not be liable* for loss of or damage to the cargo arising or resulting from unseaworthiness *unless caused by want of due diligence on the part of Owners* to make the vessel seaworthy, and to secure that the vessel is properly manned, equipped and supplied, and to make the holds and all other parts of the vessel in which cargo is carried fit and safe for its reception, carriage and preservation. Owners shall not be responsible for loss of or damage to the cargo arising or resulting from: act, neglect, or default of the master, mariner, pilot, or the servants of Owners in the navigation or in the management of the vessel; fire, unless caused by the actual fault or privity of Owners; perils, dangers and accidents of the sea or other navigable waters; act of God; act of war; act of public enemies; arrest or restraint of princes, rulers or people, or seizure under legal process; quarantine restrictions; act or omission of Charterers or of the shippers or owners of the cargo, their agents or representatives; strikes or lock-outs or stoppage or restraint of labor from whatever cause, whether partial or general (provided, that nothing herein contained shall be construed to relieve Owners from responsibility for their own acts); riots and civil commotions; saving or attempting to save life or property at sea; wastage in bulk or weight or any other loss or damage arising from inherent defect, quality or vice of the cargo; insufficiency of packing; insufficiency or inadequacy of marks; latent defects not discoverable by due diligence; *any other cause arising without the actual fault or privity of Owners, or without the fault of the agents or servants of Owners.*

Owners shall in no case be responsible for loss of or damage to deck cargo.

(Emphasis supplied)

10. *See supra,* p. 1225 for text of clause.

thy vessel. *Martin v. The SOUTHWARK*, 191 U.S. 1, 6, 24 S.Ct. 1, 2, 48 L.Ed. 65, 68 (1903). COGSA ameliorated this absolute warranty and substituted an obligation on the part of the vessel owner to use "due diligence" to make the vessel seaworthy. COGSA, 46 U.S.C. § 1303(1). Specifically, the use of the phrase "due diligence" in this charter party creates rights and obligations as understood by proctors, ex-proctors and former proctors.

Moreover, while not directly applicable, it is just one more juridical barnacle to demonstrate that the quills of those who were at work in confecting this charter were dipped deeply in the salty language of the sea which is understood by those on, in or near it, including judges who have come to savor its salty tang.

■ The Master's negligence, gross as it may be assumed, is not the test. The court was wrong in hanging on *respondeat superior*. What about privity and knowledge?

*Privity and Knowledge of Point Marine*

■ What is privity or knowledge turns on the facts of each individual case. *Gibboney v. Wright*, 517 F.2d 1054, 1058 (5th Cir.1975). The phrase "actual fault or privity" in light of the principles of the Limitation Act means complicity by managerial levels in the fault that caused the casualty. *Empire Seafoods*, 398 F.2d at 210 n. 4, 1968 A.M.C. at 2671 n. 4. Under these principles the owner is relieved of personal liability when he or managerial persons have not been personally negligent or privy to the negligence of servants or agents. *Continental*, 117 F.2d at 698, 1941 A.M.C. at 268. It is similar to the Fire Statute's, 46 U.S.C. § 182 use of the phrase "design or neglect." A finding of neglect of owner means personal negligence, or in the case of a corporate owner, negligence of managing officers and agents as distinguished from that of the Master or his subordinates. *Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo*, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30, 1943 A.M.C. 1209 (1943); *see also Earle & Stoddart, Inc. v. Ellerman's Wilson Line, Ltd.*, 287 U.S. 420, 424–25, 53 S.Ct. 200, 200–01, 77 L.Ed. 403, 1933 A.M.C. 1, 5 (1932); *Westinghouse Electric Corp. v. M/V LESLIE LYKES*, 734 F.2d 199, 210, 1985 A.M.C. 247, 256 (5th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 577, 83 L.Ed.2d 514 (1984), *Complaint of Ta Chi Navigation (Panama) Corp., S.A.*, 677 F.2d 225, 1982 A.M.C. 1710 (2d Cir.1982).

COGSA, in 46 U.S.C. § 1304(2)(b), provides that "neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—(b) fire unless caused by the actual fault or privity of the carrier...." Actual fault or privity as contained in this COGSA provision has been held to be substantially equivalent to "design or neglect" in the Fire Statute. *Complaint of Ta Chi Navigation (Panama) Corp., S.A.*, 677 F.2d at 228, 1982 A.M.C. at 1714; *Asbestos Corp. Ltd. v. Compagnie De Navigation Fraissinet Et Cyprien Fabre*, 480 F.2d 669, 672, 1973 A.M.C. 1683, 1686 (2d Cir.1973).

■ Union urges that the negligence of the Master in becoming disoriented, circling around the rig and in allowing the winch to labor for five to ten minutes was within the privity and knowledge of Point Marine's shoreside management. We simply cannot understand why. The vessel (and crew) were miles from shore and any shore-based personnel, top or low level. These acts of the Master and the crew—bewildered or not—were purely errors in navigation while at sea which, under the facts of this case imposed no liability on the vessel or owner. *See Farrell Lines v. Jones*, 530 F.2d 7, 10, 1976 A.M.C. 1639, 1643 (5th Cir.1976); *Jacobus Grauwiller Co. v. Reichert*, 136 F.2d 904, 1943 A.M.C. 822 (2d Cir.1943); *General Foods Corp. v. The MORMACSURF*, 276 F.2d 722, 1960 A.M.C. 1103 (2d Cir.), *cert. denied*, 364 U.S. 822, 81 S.Ct. 58, 5 L.Ed.2d 52, 1961 A.M.C. 288 (1960).

In determining how to interpret these common phrases we recall that the principal purpose of the Limitation Act is to afford protection to the remote owner who,

after the ship is underweigh, has no effective control over the vessel, its Master and crew. *Tittle v. Aldacosta,* 544 F.2d 752, 756, 1978 A.M.C. 112, 117 (5th Cir.1977); G. Gilmore & C. Black, *The Law of Admiralty,* § 10–20 at 877 (1975); *see also Mac Towing, Inc. v. American Commercial Lines,* 670 F.2d 543, 548 (5th Cir.1982). The disorientation of the vessel's Master and the weighing of the anchor were errors made by the Master or crew and were intimately connected with the remote navigation of the ship.

Having determined that the phrase "actual fault or privity" should be interpreted in light of the principles of maritime law and these statutes, we conclude that the established errors in navigation do not impose liability on the vessel or owner. *Farrell Lines,* 530 F.2d at 10, 1976 A.M.C. at 1643.

Union contends that the lack of a chief engineer and the lack of proper navigational charts on board the M/V POINT DOVER rendered the vessel unseaworthy which, of course, would be within the privity of Point Marine's shoreside management.

■ Although Union argues that there were indeed maps available at the time of the casualty which would indicate the position of the pipeline in the area of the platform much doubt remains in the proof. During the discovery phase of this case, Union admitted in response to Point Marine's request for admissions that there were no maps aboard the platform or commercially available which would show the position of the pipeline. Later it urged, however, that a chart was available through the Bureau of Land Management which showed the position of the pipeline. Union never proved that this Bureau of Land Management chart was reasonably commercially available—or its likely existence known to the sea-faring trade—at or before the time of the casualty. It failed to carry its burden of proof. Whatever, the trial court concluded that the predominant cause of the accident was the disorientation of the Master while he was attempting to drop anchor.

■ Union also urges that the failure to have these nautical charts aboard the vessel was due to a failure to use due diligence to make the vessel seaworthy thus permitting a finding of liability under the terms of the charter party. Although failure to provide a vessel with essential navigational charts may constitute unseaworthiness, *see e.g., Com. of Puerto Rico v. The S.S. ZOE COLOCOTRONI,* 456 F.Supp. 1327, 1333, 1979 A.M.C. 21, 26–27 (D.Puerto Rico 1978), affirmed in part, vacated in part, 682 F.2d 652, 1981 A.M.C. 2185 (1st Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336, 1981 A.M.C. 2099 (1981); *The MARIA,* 91 F.2d 819, 1937 A.M.C. 934 (4th Cir.1937), Union's argument fails since there was no proof at trial that a significant chart was reasonably available.

Union also asserts that there was an inadequate crew aboard the M/V POINT DOVER since there was no chief engineer on board. It argues that (i) the lack of a chief engineer rendered the vessel unseaworthy which, quite obviously, was within the privity of Point Marine's management, (ii) failure to have a chief engineer was a violation of 46 C.F.R. § 157.30–10 (1980), and (iii) the vessel breached its duty to exercise due diligence to make the vessel seaworthy or have it properly manned at the inception of the voyage.

■ Although the vessel must be manned with a competant crew, a deficiency in manning that has no causal connection to the damages in issue is not significant. *Southern Pacific Co. v. United States,* 72 F.2d 212, 215, 1934 A.M.C. 1185, 1189 (2d Cir.1934). In *Southern Pacific,* cargo claimants in a limitation proceeding urged that the sailing without a first assistant engineer was statutory fault triggering the application of *The PENNSYLVANIA,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). The court determined that the vessel was entitled to limitation since there was no showing of any causal connection between the lack of the engineer and the collision in that case. *See also, Gertrude Parker, Inc.*

v. *Abrams,* 178 F.2d 259, 263, 1950 A.M.C. 29, 34 (2d Cir.1949).

Union asserts that the failure to have a licensed engineer on board the vessel was a violation of 46 C.F.R. § 157.30–10 (1980) [11] and as a result, Point Marine breached the charter party and in addition, the violation triggered the application of the Rule of *The PENNSYLVANIA.*[12]

 Assuming, without deciding the applicability of the regulation,[13] we conclude that the failure to have a licensed chief engineer on board could not have been a cause of the damage to Union's pipeline. Had the chief engineer been aboard as urged, he would, or ought to have been, at his accustomed station in the engine room. How one in the engine room could have averted hooking up the pipeline is a mystery of the deep. Although the rule of *The PENNSYLVANIA* imposes a strenuous burden, it does not negate the clear requirement of causation. *Candies Towing v. The M/V B & C ESERMAN,* 673 F.2d 91, 1983 A.M.C. 2033 (5th Cir.1982). Whatever statutory violation occurred, it did not have anything to do with the pipeline snag.

REVERSED.

---

**11.** 46 C.F.R. § 157.30–10 (1980) states in pertinent part:

*Officers for Uninspected Vessels*

(b) Every vessel, however propelled, 200 gross tons or over in navigating the high seas and subject to the provisions of R.S. 4438a, as amended (46 U.S.C. 224a), shall have officers licensed by the Coast Guard. No person shall be engaged to perform or shall perform on board any such vessel the duties of Master, chief engineer, navigating officer in charge of the watch or engineer officer in charge of the watch unless he holds a valid license issued by the Coast Guard attesting to his qualifications to perform such duties.

(2) If an uninspected vessel engages in a voyage of over twelve hours duration, such vessel shall have a Master, mate, chief engineer, and assistant engineer and such officers shall be in charge of their respective watches continuously. . . .

**12.** *See generally,* Pitts, *Admiralty's Pennsylvania Rule,* 24 S.Tex.L.J. 541 (1983).

**13.** This provision applies to uninspected vessels. We could not glean from the record the specific evidence to support its application. Nevertheless we do not need to reach this question for the reasons stated herein.