**HANSON & ORTH, INC., MGC Commodity Corp., Langston Bag Company, Ludlow Corp., Heads and Threads Company, Division of MSL Industries, Inc., Plaintiffs,**

v.

**M/V JALATARANG, her engines, gear, tackle, et cetera, Scindia Steam Navigation Company, Ltd., Smith and Kelly Company and Georgia Ports Authority, Defendants.**

No. CV475–131.

United States District Court, S. D. Georgia, Savannah Division.

April 24, 1978.

James H. Simonson, Bigham, Englar, Jones & Houston, New York City, for plaintiff Hanson & Orth, Inc.

Edwin D. Robb, Jr., Bouhan, Williams & Levy, Savannah, Ga., for other plaintiffs.

Lamar C. Walter, Chamlee, Dubus & Sipple, Savannah, Ga., for defendant Shipowner Scindia Steam Navigation Co., Ltd.

Ralph O. Bowden, III, Hunter, Houlihan, Maclean, Exley, Dunn & Connerat, Savannah, Ga., for defendant Smith and Kelly.

Griffin B. Bell, Jr., Lee & Clark, Savannah, Ga., for defendant Georgia Ports Authority.

## OPINION

*Findings of Fact and Conclusions of Law*

LAWRENCE, District Judge.

### I

On the night of May 30, 1974, a fire broke out aboard the M/V JALATARANG while longshoremen were discharging bales of burlap and jute at Savannah. The vessel was owned by Scindia Steam Navigation Company, Ltd. and was of Indian registry. She had carried the cargo from various ports in that country. Part of it was discharged at the Georgia Ports Authority terminal where the vessel berthed. Smith and Kelly Company performed stevedoring services for the JALATARANG.

Plaintiffs are consignees of the burlap and jute which was damaged by a combination of fire, smoke and water. The defendants are the vessel; Scindia Steam Navigation Company, owner; Smith and Kelly Company, stevedore, and Georgia Ports Authority, wharfinger.[1]

Scindia counterclaimed against the plaintiffs for general average expenses in extinguishing the fire in an effort to preserve the cargo and vessel. The shipowner also filed a cross-claim against Smith and Kelly seeking indemnity by reason of the latter's breach of warranty of workmanlike performance of its stevedoring obligation.

The action was brought under Rule 9(h) and is within the admiralty and maritime jurisdiction. It was tried before the Court on December 20–21, 1976, following voluminous discovery.

The basic questions are:

(a) whether Scindia and/or Smith and Kelly are liable to plaintiffs for the cargo loss and

(b) whether, if both the shipowner and stevedore are liable to the consignors, is the former entitled to indemnity from the stevedoring company because of a breach of its implied warranty of workmanlike service?[2]

---

1. At the conclusion of the evidence, this Court sustained the motion of Georgia Ports Authority for an involuntary dismissal. Informal findings of fact and conclusions of law were made from the bench in favor of GPA. Transcript, pp. 320–21. However, they have not been formalized and entered.

2. As to implied warranty in such cases, see *Italia Societa, etc. v. Oregon Stevedoring Co.*, 376 U.S. 315, 321, 84 S.Ct. 748, 11 L.Ed.2d 732; *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133; *Southern Stevedoring & Contracting Company v. Hellenic Lines, Limited*, 388 F.2d 267, 270 (5th Cir.).

## II

Jute is a highly inflammable vegetable fiber. One of the expert witnesses, Dr. Reginald Milton, testified:

"A characteristic feature of the jute fiber is a lot of tiny, little hair-like protrusions occur over the staple lengths, so that if you produce an ignition at one of these staples—because they are so fine and because they are so dry—the fire very rapidly flies along the whole length of the fiber, and if you have a series of bales close together and you get an ignition point, very rapidly the surface of the fiber of the jute will be covered with flame because of the rapidity of which these little fibers transmit the flame from one to another and the whole of the surface can be quickly inflamed. . . ." See deposition, pp. 7–8.

According to another expert, fire will "spread very quickly, particularly in raw jute, and because of the nature of that and burlap, it will eat into the heart of the bale and it is extremely difficult to extinguish by hoses." Testimony of Frank Rushmore, Tr. pp. 273–274.

Jute is officially classed as a hazardous substance. 46 CFR § 146.27–25(a). As such, it is subject to various regulations, including stowing and handling. 46 CFR § 146.27. They require that "Fire hose shall be connected" and that "pressure shall be maintained on the fire mains during loading, ready for instant use." Portable fire extinguishers shall be so placed as to be readily available. 46 CFR § 146.27–25(c)(4). However, the regulations do not require fire extinguishers in the holds unless lift trucks are in operation. 46 CFR § 95.50–10(a).[3]

The safety regulations of OSHA covering longshoring provide that "lighting wires and fixtures for portable lights shall be so arranged as to be free from contact with drafts, running gear, or other moving equipment." 29 CFR § 1918.29(b)(3).

Coast Guard regulations require checking for and eliminating any source of spark. 46 CFR § 146.27–25(c)(3).

## III

The evidence as a whole leaves no real doubt concerning the origin of the fire that broke out in No. 3 hold on May 30, 1974. The JALATARANG was scheduled to depart Savannah at 9:30 P.M. that day. The discharge of No. 4 hold was completed around 8:45 P.M. The longshoremen of Smith and Kelly were then directed to complete the unloading of the 20 to 25 burlap bales remaining in the wing of the No. 3 starboard aft deep tank.

Richard Lexley, Jr. was the "header" of the gang of the longshoremen working in hold No. 3. Illumination of the wing of the deep tank where the bales were stowed was supplied by a cluster light. There is no permanent lighting in the cargo holds and drop lights are commonly used in stevedoring work. Tr. pp. 141, 174–175. The lamp involved was attached to a rubberized 70 to 75-foot length of cord which was plugged into a receptacle located in the masthouse on the weather deck. The drop light and cord is ship's equipment. It was lowered into the hold and was positioned in the deep tank by the longshoremen. The cord was pulled under the coaming of the deep tank and tied by rope to the ship's structure. It was at the starboard aft corner of No. 3 deep tank so as to see into the aft parts thereof. Tr. pp. 35, 42–43, 93–95, 124–125, 128, 141, 175–176, 207, 280. According to Larry Hadwin, the stevedore foreman of Smith and Kelly, the light was safely positioned in the "most out of the way place." Tr. p. 141.

The unscaled drawing below represents a cross-section of hold No. 3, showing the position of the light and other relevant features.

---

3. It is not common practice to place extinguishers in cargo holds. Tr. pp. 138, 149, 190, 274.

The fire in the deep tank broke out around 9:25 A.M. Richard Lexley, the header of the gang, testified that he was "looking right dead up at the wire." He referred to the steel wire or "runner" leading from the block to a rope sling made up of eight ropes with cargo hooks. Four bales of burlap were attached. The hooks are placed under the bands. The bales weigh from 500 to 600 pounds each. Lexley testified that "the wire hit the electric cord and cut it." That produced a spark which dropped 8 to 10 feet onto the jute. The steel runner became entangled with the light cable, cutting it near the coaming of the deep tank, according to Lexley. The resulting fire spread very fast. Tr. pp. 44–46, 58–59.

Willie Stevens who was also working in the deep tank testified: "[W]e was making a pull around this extension (stanchion) down there out of this tank, and . . . this cable hit this steel comb up there. And a spark lit up and hit the floor . . . on top of this jute." He said that the spark

fell from near the coaming. Deposition, pp. 5, 10.[4]

## IV

The basic version of the eyewitnesses is supported by other evidence as well as by the testimony of experts. What the longshoremen refer to as a "spark" is technically known as an "arc." (See Tr. pp. 245–246). Mr. Frank Rushbrook described it as "an intensely hot spark over three thousand degrees Fahrenheit" which "instantly cuts off the supply of electric current . . . butts off a section of wire and fuses the ends of the wire into a typical situation which is a molten blob of metal . . . ." Tr. p. 230.

Cargo is discharged by means of a gantry crane on the shore-side. The equipment in question is owned and operated by Georgia Ports Authority. The boom is connected by two crane cables to a large pulley block containing a hook. The block is too heavy to be positioned by the longshoremen under the top of the deep tank. The procedure used is to attach a rope sling to the hook on the block. Tr. pp. 33–36. It is attached to the block by means of a steel cable or runner approximately 15 feet long. When the bales are pulled out of the wing by the gantry crane, the runner makes a right angle turn upward toward the coaming, scraping against it until the draft reaches the square of the hatch of the tank from which point it is lifted vertically from the hold. Tr. pp. 33–34, 36, 47–48.

When the bales are hooked to the sling, the header signals a flagman stationed on deck. He relays it to the operator of the gantry crane. When the slack was taken up by the pull, the runner was under great pressure due to the weight of the bales and the steel cable scraped hard against the underside of the coaming where the light cord was. The bales stowed close to the overhead of the deep tank cannot be lifted without the runner scraping the coaming, according to Lexley. Tr. pp. 39–40. Apparently it slid sideways across the bottom of the coaming and because of the upward force of the draft the insulation was torn.

A short circuit resulted forming an arc of molten copper.

The drop light and cord were retrieved on the day following the fire. At a point three feet from the lamp the insulation of the wire was torn almost completely through. Both the plus and minus wires in the cord were cut. Approximately a one-inch section of both had burned away.[5] Tr. pp. 230–232. Mr. Rushbrook, a fire consultant, who testified for plaintiffs, said that "as the wire splits, the electricity jumps the gap created by the broken wire and then it cuts away, it burns away instantly a section of wire which drops glowing white hot to the ground from wherever the cut occurred." Tr. pp. 230–236.

The plaintiffs' expert witness was "absolutely convinced" that the cause of the fire was a direct short circuit on the cluster light cable which caused molten metal to drop on the jute or gunnies. Tr. p. 245.[6] Dr. Milton thought that it was "a clear-cut case of the cable to the light having been fouled and this caused a short and sparks fell onto the jute and this initiated the fire." Deposition, p. 19.

This Court accepts that version of its origin.

## V

When the spark ignited the jute, the longshoremen yelled "fire." They attempted to beat out the blaze with their jackets

---

4. The flagman, Andrew Williams, testified that the "bale hook hit the stanchions. It was iron stanchions in there and the bale hook . . . made a spark" which "dropped right down into those bales." Deposition, pp. 10, 15.

5. The lamp and cord is an exhibit in the case. Pl. Ex. 15. There are also photographs. Pl. Ex. 1 and 7.

6. I realize that Mr. Hadwin denied that the electric cord was cut. His testimony was that the light was still burning after the fire commenced. Tr. pp. 109, 125, 218. However, Mr. Lexley testified that the light went out when the cord was severed. Tr. p. 77. Captain Moos said that the portable light was not burning. Tr. pp. 177, 218.

and by emptying the drinking water bucket on it. Tr. pp. 48–50. One of the men stepped on the "spark" which only served to spread it under his foot. Stevens' deposition, pp. 11, 13. The flagman on the deck yelled to the stevedore foreman, Larry Hadwin, who was standing on the pier: "[W]e need a fire extinguisher, we got a fire in the hold." Hadwin ran to hatch No. 3. Looking down into it, he saw a flicker of fire in the mid part of the aft starboard tank a little forward of the stanchions. He stated that he told a member of the crew to sound the fire alarm and that he and the flagman untied the hose lying on the deck. Tr. pp. 86–87.

Hadwin testified that the hose was connected to the hydrant. He threw it down in the hold. However, the valve on the hydrant was too tight and would not move. A wrench or hammer had to be used to loosen it. According to the stevedore foreman, the hose turned out to be only about 30 feet long. The fire hydrant near No. 3 hatch is approximately 20 to 25 feet from the McGregor hatch. Mr. Hadwin testified that the distance from the main deck to the coaming of the deep tank is approximately 25 feet. The hose extended only 5 or 6 feet beneath the coaming of the upper hold. It was too short to fight the fire. Furthermore, the hose had no nozzle. Hadwin obtained another 30-foot length of hose which was coupled to it. A crew member found a nozzle. Tr. pp. 103, 88–93, 118; deposition of Andrew Williams, pp. 10, 12–13, 16, 29, 30–32, 35.

The Captain of the JALATARANG, Pesi A. Moos, testified that two hoses were used. The second was connected with the forward hydrant. It was "a little bit short" and was coupled to another sixty-foot length hose. This took 4 to 5 minutes, he said. Tr. pp. 163–164.

Hadwin and Lexley went down into the lower hold to fight the fire. The smoke was so thick they had to lie on the floor. They remained in the hold until directed by the Captain to come above. Hadwin said that it was not until he left that the crew participated in fighting the fire.[7] They put a second hose in the tweendeck. Three of the crew members were equipped with breathing helmets or masks with cylinders. Tr. p. 172.

Meanwhile, the fire fighting equipment of Georgia Ports Authority and the Garden City Fire Department were on the scene. Later the Savannah Fire Department sent a unit. In spite of efforts to control the fire, it kept spreading. Tr. p. 165. Three hours after the fire broke out Captain Moos decided that it was out of hand. The crew members were ordered out of the hold. The hatches on the weather deck were battened down and both of the aft deep tanks in hold 3 were flooded with water to the top of the coaming. Tr. pp. 165–168, 171–172. The Master ordered both tanks flooded because he thought sparks may have entered the one in which the fire was not centered. Tr. pp. 171, 220–221. Heavy water damage occurred in that tank. After the hatch was closed, numerous cylinders of $CO_2$ gas were discharged into the hold through the ship's system. Tr. pp. 168–171.

## VI

The testimony summarized above concerning alleged acts and omissions by the shipowner after the arc ignited the jute is in considerable dispute. It is challenged by the Master.

The JALATARANG was launched at Glascow in 1963. She has a gross tonnage of 12,088.10 and is 518.6 feet in length. The vessel's cargo space is divided into five holds forward of the deck house. No. 3 is divided by an upper tweendeck 10' 8" high and a lower hold 12 feet deep. There are four deep tanks (12 feet in depth) in No. 3 hold with a hatch opening 18' 5½" times 11'. The deep tanks or wings extend back under the lower hold to the skin of the ship.

After a hull and machinery survey by Indian authorities in April, 1974, a Cargo Safety Equipment Certificate was issued on

---

7. In another part of Mr. Hadwin's testimony he said that some of the crew were "down there trying to get something hooked up." Tr. pp. 62, 65.

the vessel. Tr. p. 195; Scindia Ex. 1. The ship was equipped with the following required fire fighting equipment; eight fire hydrants located on the portside of the shelter decks; seven 60′ lengths of 2½ inch fire hoses with instantaneous couplings on deck; six 2-gallon water carbon dioxide fire extinguishers and one 30-pound foam extinguisher in the accommodations; five 55-gallon drums with galvanized buckets; three smoke masks; six jet nozzles with instantaneous couplings; one spray jet nozzle with instantaneous couplings; one combined smoke detecting and $CO^2$ fire extinguishing installation for cargo spaces with 86 bottles of $CO^2$; a main pump and two emergency fire pump units, and a fire alarm system. Tr. pp. 193–194.

The JALATARANG was equipped with hoses and hydrants to get two jets of water into any part of the ship. One 60′ length of hose would reach from the shelter deck hydrant to the No. 3 hold directly above the deep tanks, a distance of approximately 50′. Tr. pp. 194, 222. New fire hoses were placed on the vessel before the voyage and all fire extinguishers were tested and refilled at Calcutta in April, 1974. Tr. pp. 195, 203. The Master was required under Indian law to hold fire drills on the vessel at least once each fifteen days. The last fire drill before the fire occurred was on May 12, 1974. Tr. pp. 191, 196. Before each voyage, the chief officer prepared a Muster List which received the approval of the Master. The list, indicating each man's boat station and fire station and duties, was posted in the crew's quarters. The chief officer also prepared a boat card stating the crew's stations and duties in the event of fire and boat drills. Tr. pp. 196, 197; Scindia Ex. 2 and 3.

Upon the arrival of the vessel at Savannah, an inspection was made by J. L. Harwell representing National Cargo Bureau, Inc. He found the vessel to be in compliance with CFR regulations in the discharge of jute and burlap as well as the recommendations of the Bureau. Scindia Ex. 7. Such as inspection includes looking for the hoses and ascertaining whether they are connected to hydrants. Tr. pp. 263, 265.

The Coast Guard also inspected the vessel to ascertain whether she was ready to discharge. Clearance was given. Tr. pp. 201–202; Scindia Ex. 4. The inspection embraces the fire fighting equipment. Tr. p. 223.

## VII

A stevedore's measure of care in loading and discharging a vessel is ordinary diligence to the cargo owner and it is liable for damage or loss caused by its negligence. *Demsey & Associates, Inc. v. S.S. Sea Star,* 461 F.2d 1009, 1016 (2nd Cir.). As for causation, the modern concept of "legal" rather than "proximate" cause in negligence prevails in this Circuit. An independent intervening cause does not necessarily relieve one who is negligent when it is a substantial factor in bringing about the event. *Spinks v. Chevron Oil Company,* 507 F.2d 216, 222 (5th Cir.); Restatement 2d Torts § 9.

To the extent that under maritime law foreseeability is relevant in respect to duty and causation such element is established by the evidence here. The management of Smith and Kelly was aware that jute and burlap is a hazardous cargo with highly flammable qualities. Tr. pp. 143–144. The evidence is that the electric cord supporting the lamp was only 2 or 3 feet from the steel runner attached to the sling. As the longshoreman header testified "[w]hen you are pulling, you've got a pressure and that wire [runner] is going to run, that's what it did. When it tightened up here it slid down . . . and it hit that wire and cut it." Tr. p. 47.

Charles L. Sullivan, marine surveyor, testified that the stevedore should have placed the light and cord away from the "boom wire" so that they could not come into contact with each other. Tr. pp. 280–281. According to Mr. Lexley, where burlap bales are stored at the top of the deep tank the steel runner generally scrapes against the coaming when the crane pulls the cargo into the square of the hatch. Tr. pp. 39–40. The stevedore foreman agreed that the light cord should be placed so that there

would be no contact and he was aware that an arc could be produced. Tr. p. 124. While Hadwin did not think the spark was generated by the light cord being severed, he conceded that it would have been good practice for the longshoremen to move the wire away from the steel runner. Tr. pp. 124–125. Plaintiff's expert, Mr. Rushbrook, expressed the view that a stevedore handling this type of cargo had a responsibility to insure that the hazard be minimized by routing the cable so as to avoid fouling by the runner. Tr. p. 247.

■ I earlier noted that the longshoring standards established under the Occupational Health and Safety Act provide that "Lighting wires and fixtures for portable lights shall be so arranged as to be free from contact with drafts . . . or other moving equipment." 29 CFR § 1918, 29(6)(3). The OSHA standard was clearly applicable. It possesses the force of law. *Florida Peach Growers Association, Inc. v. United States Department of Labor*, 489 F.2d 120 (5th Cir.); 29 U.S.C. § 654.

In many jurisdictions the violation of a statute or regulation constitutes negligence *per se*. See Prosser *Torts* 2d § 36, p. 200. If so, the existence of a causal connection between the statutory violation and the ensuing event is all that concerns the trior of the facts. I am uncertain as to whether an act or omission by a stevedore which is violative of OSHA safety standards constitutes negligence in and of itself. Some confusion surrounds the subject. See *Buhler v. Marriott Hotels, Inc.*, 390 F.Supp. 999 (E.D., La.); *Gallardo v. Westfal-Larsen & Co. A/S*, 435 F.Supp. 484, 501 (N.D., Cal.); *National Marine Service, Inc. v. Gulf Oil Company*, 433 F.Supp. 913 (E.D., La.); *Arthur v. Flota Mercante Gran Centro Americana S.A.*, 487 F.2d 561, 564 (5th Cir.).

In all events, however, the OSHA standard in respect to the proximity of portable lights to drafts was violated by Smith and Kelly. The crew had nothing to do with the placing of the light. The Longshoreman fastened it in the deep tank. "My men are not supposed to enter any compartment when the stevedore laborers are working." Moos, Tr. p. 179.

■ This Court finds that the negligent failure of Smith and Kelly to comply with the standard governing placement of portable lights caused the fire aboard the JALATARANG. The stevedoring company's management was aware of the consequences of the jute being ignited. Tr. p. 143.

## VIII

The cargo owners contend that Scindia contributed to the outbreak of the fire as well as the resulting damage by not having a crew properly trained in fire fighting and by failing to provide adequate and readily available equipment, including a fire extinguisher in the deep tank and a hose of sufficient length to fight the fire properly. Plaintiffs argue that the negligence of the shipowner and the violation by it of safety regulations was a proximate cause of the fire. The cargo interests further contend that but for the owner's dereliction the fire would either have been completely controlled or the cargo damage greatly reduced. Tr. pp. 134, 276–278.

Smith and Kelly makes the same charges against the shipowner with emphasis on the failure of the crew to minimize the loss as a result of lack of adequate fire fighting measures and equipment.

Scindia interposes the affirmative defense that the Fire Statute exonerates it as shipowner. 46 U.S.C. § 182. This 1851 Act provides that "No owner of any vessel shall be liable to answer for or make good to any person any loss or damage which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

The Carriage of Goods by Sea Act contains a similar provision. "Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from . . . Fire, unless caused by the actual fault or privity of the carrier." 46 U.S.C.

§ 1304(2)(b). The terms "design or neglect" of the owner and "actual fault or privity" bear the same meaning. *Asbestos Corp., Ltd. v. Compagnie De Navigation Fraissinet et Cyprien Fabre et al.*, 345 F.Supp. 814 (S.D., N.Y.), aff'd 480 F.2d 669 (2nd Cir.).

 Design or neglect means a causative act or omission wilfully or knowingly done or permitted by the owner personally. *Hershey Chocolate Corporation v. The Robert Luckenbach*, 184 F.Supp. 134 (D., Or.), aff'd 295 F.2d 619 (9th Cir.). "Neglect" in the case of a corporate shipowner contemplates negligence of the managing officers and agents as distinguished from the master or members of the crew or subordinate employees. *Consumers Import Co. v. Kabushiki Kaisha Kawasaki Zosenjo*, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30; *Albina Engine & Machine Works, Inc. v. Hershey Chocolate Corporation*, 295 F.2d 619 (9th Cir.). Negligence by a crew in fighting a fire cannot be imputed to a shipowner seeking exoneration from liability. *Complaint of Caldas*, 350 F.Supp. 566 (E.D., Pa.), aff'd without opinion, 485 F.2d 678, 680 (3rd Cir.).

 The courts have, however, read an exception into the fire statutes. The exemption therein does not extend to a carrier who fails to provide adequate and properly located fire fighting equipment or a properly trained crew. See *Asbestos Corp., Ltd. v. Compagnie De Navigation Fraissinet et Cyprien Fabre et al., supra*, 480 F.2d at 672; *Re Liberty Shipping Corporation*, 509 F.2d 1249 (9th Cir.); *Complaint of Caldas, supra*, 350 F.Supp. 566.[8]

 As to the burden of proof in establishing personal neglect or fault of the shipowner in fire damage cases, the better rule would appear to be that under the Fire Damage Statute and the COGSA limitation where loss by fire occurs aboard a vessel, it is up to the libellant to show personal neglect and fault of the owner. See 2A *Benedict on Admiralty* (7th ed.) §§ 142–143; *Hershey Chocolate Corporation v. The Rob-*

*ert Luckenbach*, 184 F.Supp. 134, 139, *supra*, aff'd 295 F.2d 619. *Cf.* Gilmore and Black, *The Law of Admiralty* (2nd ed.) pp. 896–897.

## IX

The matter of negligence by the shipowner and violation of safety requirements and the matter of fault or neglect of the owner cover much the same ground and I will treat them together.

Plaintiffs' fire expert, Frank Rushbrook, is the author of a work entitled *Fire Aboard* published in London, New York, and Mexico City. He is a resident of Edinburgh and a fire consultant. He was in the courtroom throughout the trial and heard the testimony of various witnesses.

Mr. Rushbrook was critical of Scindia's performance and practices in fire fighting. He testified that in the case of a cargo of jute any fire must be attacked within seconds rather than minutes. Tr. p. 251. There should be a portable extinguisher adjacent to where the men are working. Had there been one in the hold of the JALATARANG, it is "quite possible" that the fire could be extinguished. The hose on deck should be attached to the fire main with a nozzle of the spray type. Tr. pp. 236–240. He expressed the opinion that the crew of the vessel was not as efficient and not trained as efficiently as he would like to see. Tr. pp. 243, 255. He criticized a number of the procedures followed, including the fact that there was no ship's officer on the deck in the vicinity of the hold when cargo is being worked. According to the witness, he should have been there.

Mr. Hadwin testified that had the hose been immediately ready, he could have been down in the hold in a half minute. In that event and if there had been a longer hose, they might have, or could have, contained the fire. "I don't know, we might have had a chance," he said. Tr. p. 119. In his

---

8. An extensive annotation on the application of 46 U.S.C. § 182 is found in 25 A.L.R.Fed. 287–324. See also the discussion of the Fire Statute in 2A *Benedict on Admiralty* (7th ed.) §§ 141–

148. For comments on *Asbestos Corp., Ltd.* attention is called to the case note in 5 *Journal of Maritime Law and Commerce* (Oct., 1973) pp. 129–134.

opinion, if a fire extinguisher had been available in the hold, the fire could have been definitely controlled. Tr. p. 139. Mr. Rushbrook thought that in that case the fire "might well" have been extinguished. Tr. p. 246.

William C. Thomas is Stevedore Superintendent of Smith and Kelly. When asked whether it would be good practice to have an extinguisher down in the hold, he replied: "After this occasion it probably would be. But, I still think a fire hose, running fire hose of adequate length would be better." Tr. p. 146. Hadwin thought that with a longer hose "there's a possibility we could have put it out." Tr. p. 119.

The testimony of Captain Moos is in conflict with the versions of Hadwin and Lexley in several material respects. He testified that he was in his cabin when the Chief Officer reported that there was a fire. He looked out and saw white smoke coming out of No. 3 hatch and immediately went to it. The fire alarm was sounded. Tr. pp. 154–155. When he looked down into the hold he saw his men fighting the fire with one hose. Tr. pp. 155, 159, 214. This could not have been over two minutes after the fire commenced. He is positive that the hose was 60-feet long and that an adjustable nozzle was affixed. Subsequently another hose was placed in the hold. According to the Master, there was no way for a 30-foot hose to have gotten mixed in with the hoses of 60-foot lengths. Tr. p. 211.

## X

(a) Plaintiffs contend that the shipowner did not adequately train its officers and crew in fire fighting. I hardly think that merchant ship's officers are required to take courses in fire fighting at a training school, such as the one Mr. Rushbrook established at Edinburgh which was equipped with a landside replica of a ship's engine room. Tr. p. 241. The evidence in the present case is that the Indian statute requiring fire drills twice a month was complied with. The last such drill before the vessel berthed at Savannah was held on May 12, 1974. Tr. pp. 191–192, 196, 223.

Captain Moos testified as to the manner in which the fire drills were conducted. Tr. pp. 196–198.

The Cargo Ship Safety Equipment Certificate issued at Calcutta on April 3, 1974, is in evidence. See Scindia Ex. 1. It certifies that "the inspection showed that the ship complied with the requirements of the said Convention as regards fire fighting appliances and fire control plans." On the same date, a record of safety equipment was filed. Among other things, it described the number and length of hoses. Plaintiffs' Ex. 10. Also in evidence is the Fire Station assignments of personnel to the various stations and duties. Scindia Ex. 2.

Upon her arrival at Savannah and prior to discharge, the JALATARANG was inspected by a representative of the National Cargo Bureau. The surveyor, Mr. Harwell, certified that the Bureau's recommendations had been conformed to. Scindia Ex. 7. The vessel was cleared by the Coast Guard. Scindia Ex. 4. The inspections included the fire fighting equipment. Tr. pp. 223, 263, 265.

Mr. Hadwin testified that on the night of the fire the Master said he was disturbed about the fire fighting method. This was denied by Captain Moos. Tr. pp. 108–109, 203, 223. Charles Sullivan, the marine surveyor, testified that he saw the stevedore foreman at the time the tanks were being flooded and inquired of him how rapidly the crew had responded to the fire. Hadwin's answer was to the effect that they "acted expeditiously." Tr. pp. 271–272. He could not recall having seen Mr. Sullivan that night or what he (Hadwin) may have said to him. Tr. pp. 314–316.

██ (b) The Coast Guard regulations pertaining to hazardous cargo apply to shipowners and charterers. Portable fire extinguishers shall be so placed as to be "readily available." 46 CFR § 146.27–25(c)(4). However, extinguishers are not required unless lift trucks are in operation in the hold. 46 CFR § 95.50–10(a). It is not customary practice to have extinguishers there. Tr. p. 175. In the present case the

extinguishers were kept on deck. They were used that night in hold No. 4 which was subject to great heat as a result of the fire in No. 3. Tr. p. 204. The phrase "readily available" is subject to various meanings. However, unless the Coast Guard safety regulations are self contradictory, those words do not require extinguishers where stevedoring work is being performed without lift trucks. Smith and Kelly's Stevedore Superintendent interpreted "readily available" to mean placing extinguishers at specific places on the deck. Thomas, Tr. p. 149. Neither ordinary care nor the Coast Guard regulations required more.

(c) Coast Guard regulations require that "Fire hose shall be connected" and "Fire pumps shall be seen in operation prior to loading and pressure shall be maintained on the fire mains during loading ready for instant use." CFR § 146.27–25(c)(4). The evidence is that the hose was connected to the hydrant at No. 3 hatch and there was adequate pressure on the fire mains. Tr. p. 205.

Both the cargo owners and Smith and Kelly claim that the hose at No. 3 hatch was too short; (b) that there was no nozzle, and (c) that the valve on the hydrant was stuck. Mr. Hadwin testified that "a good six, seven, maybe eight minutes" were wasted in turning the valve, coupling another hose and obtaining a nozzle. Tr. p. 112.

The facts are in sharp dispute in this area of the litigation. Captain Moos claims that within two and a half minutes after he turned on the electric gong alarm on the bridge he saw his men down in the hold fighting the fire with a hose. He testified that the 60-foot hose serving hold No. 3 was flaked on the deck and had a nozzle. He was positive that no 30-foot length hose could have been there. The two hoses of that length were kept in the machinery room. Tr. pp. 211–212. The "Record of Safety Equipment" (Plaintiffs' Ex. 10) shows that there were nine 60-foot hoses and two 30-foot hoses aboard the JALA-TARANG. Unless the inspections by the National Cargo Bureau and the Coast Guard were of the most perfunctory sort, it is difficult to understand how the alleged deficiencies, other than the tight valve, would have escaped their attention.

## XI

Two observations are in order concerning the conditions that existed aboard the vessel and exactly what occurred after the fire broke out in hold No. 3.

■ Apart from the difficult problem of determining what is the truth and who is telling it, the shipowner has not been shown to have been at actual fault or neglect. The burden of proving that the owner was personally involved in causing the fire or in failing to have adequate equipment to fight it rests on the libellants. It is not enough to prove that the crew negligently fought the fire. *Complaint of Caldas, supra,* 350 F.Supp. at 573.

■ "Once the defendant has sustained the burden of proving that it comes within the exemption of COGSA § 1304(2)(b) or the Fire Statute the burden then shifts to the shipper to prove that the fire was caused by the 'design or neglect' or 'actual fault or privity' of the carrier." *Asbestos Corp., Ltd. v. Compagnie De Navigation Fraissinet, supra,* 345 F.Supp. at 821; *Sunkist Growers, Inc. v. Adelaide Shipping Lines, Ltd. et al.,* 1976 A.M.C. 2597 (N.D., Cal.).

I do not think the cargo owners in this case have carried the burden of proof imposed on them. But beyond that issue and irrespective of existence of any negligence by the owner and crew, we are confronted with the question of the causal relationship between the cargo loss and the acts or omissions of Scindia.

Jute fires are notoriously difficult to fight. Mr. Rushbrook testified that they must be "tackled immediately within seconds rather than minutes." The water should be on the fire in two seconds, he added. If it is not within two or three minutes, the only way to fight the fire is to flood the tanks. Four minutes is the upper

limit for getting water on the fire. After that it is too late, according to Rushbrook. Tr. pp. 236, 246, 250–251. Dr. Milton's testimony was along the same line. In view of the difficulty of working a hose in the wings, he was of the opinion that "by the time they had got their hose fixed up and down the hold, it might already have been well beyond the point of no return." Deposition, pp. 14–15.

 The record is full of such words as "might" or "possibly." Surmise and speculation are not a reasonable basis for a verdict. *American Casualty Company of Reading, Pennsylvania v. Myrick,* 304 F.2d 179, 183 (5th Cir.); 30 Am.Jur.2d Evidence § 1164. "Jurors are repeatedly charged that their verdicts cannot be based upon speculation or conjecture. The court in a non-jury case must be guided by the same principle. 'Speculation' is the art of theorizing about a matter as to which evidence is not sufficient for certain knowledge." *Jaramillo v. United States,* 357 F.Supp. 172, 175 (S.D., N.Y.). The speculative nature of the evidence as to causal effect bears heavily on whether or not plaintiffs have borne the burden of proof in respect to the liability of Scindia.

I find that the cargo owners have failed to carry it here.

### XII

Smith and Kelly maintains that under the Himalaya Clause contained in the bills of lading the stevedore is a beneficiary of the limitation of liability established by the Fire Statute and by the COGSA exemption.

Clause 17 of the bill of lading provides:

"Neither the carrier nor any corporation owned by, subsidiary to, or associated or affiliated with the carrier, shall be liable to answer for or make good any loss or damage to the goods, occurring whether before, during or after loading or discharge by reason or by means of any fire whatever, wherever and however occurring, unless such fire is caused by carrier's design or neglect."

Clause 28 states that other than the shipowner or charterer no other person, firm or corporation, including master, officers and crew of the vessel and "all agents and independent contractors," shall be liable with respect to the goods as "carrier, bailee or otherwise howsoever in contract or in tort." Clause 28 goes on to state that all limitations and exonerations provided by law or by the contract shall be available "to such other," should it be "adjudged that any other than the shipowner or demise character is carrier or bailee of the goods or under any responsibility with respect thereto."

Smith and Kelly maintains that it is a third party beneficiary of the statutory exemptions in the light of Clause 28. Its counsel argues that a carrier is free to contract with the owner of cargo to limit the liability of the carrier's agents, such as stevedores. *Secrest Machine Corporation v. S.S. Tiber,* 450 F.2d 285 (5th Cir.). A provision in a bill of lading identical to Clause 28 has been held to entitle the stevedore to the COGSA limitation of $500 per unit in the case of cargo damage. *Bernard Screen Printing Corporation v. Meyer Line,* 464 F.2d 934 (2nd Cir.). In *Grace Line, Inc. v. Todd Shipyards Corporation,* 500 F.2d 361, 373 (9th Cir.) a distinction is drawn between part and whole immunization of a non-carrier from liability for its negligence. See in that connection, Healey, "Carriage of Goods by Sea: Application of the Himalaya Clause to Subdelegees of the Carrier," *The Maritime Lawyer,* II (1977), 91, at 111.

 Where a stevedore is to be made a third party beneficiary under a charter party, the intent to do so must be expressly recited. *Marubeni-IIDA v. Toko Kaiun Kabushiki Kaisha,* 327 F.Supp. 519 (S.D., Tex.). Strict construction is the rule in exculpatory provisions. *Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 301–303, 79 S.Ct. 766, 3 L.Ed.2d 820; 2A *Benedict on Admiralty* § 169. Random and generalized terms in a bill of lading that do not show a clear intent to limit the liability of a third party are not enough. *De Laval Turbine, Inc. v. West India Industries, Inc. et al.,* 502 F.2d 259, 268 (3rd Cir.).

■ I do not think that it was remotely intended by the parties to the contract of affreightment that the clauses quoted afforded the protection of the fire statutes to Smith and Kelly. It acted solely in the capacity of stevedore in handling and discharging the cargo. I regard the language of Clause 28 as meaning that only when "such other" person is adjudged to be a carrier or a bailee or is under any responsibility with respect to the goods such third party may benefit from a limitation statute. In my opinion, the term "under any responsibility" can only be interpreted as having responsibility for the goods in a capacity of carrier or bailee or a status akin thereto. I do not find the Himalaya-clause argument of Smith and Kelly convincing.

## XIII

At the conclusion of the trial the motion of Georgia Ports Authority for involuntary dismissal was granted and informal oral findings of fact made from the bench. Tr. p. 332. That ruling is now formalized.

The evidence shows that Georgia Ports Authority maintains a fire department. The fire fighting unit consists of a fire truck equipped with a pump. The fire aboard the JALATARANG was not reported to the Security Officer of GPA until around 9:40 P.M., some 15 minutes after the jute ignited. Seven minutes later the fire truck was at the pier opposite hatch No. 3. The hose was connected to a hydrant on shore and was carried to the deck. Tr. pp. 285–287.

By the time the fire was reported to Georgia Ports Authority it was much too late for there to be a causal connection between the alleged omissions of Georgia Ports Authority and the cargo damage. The Authority did not cause or contribute in any way to the loss. Tr. p. 123.

■ On the basis of that finding, judgment will be entered in favor of Georgia Ports Authority. In the light of this conclusion, it is unnecessary to pass upon the Authority's contention (a) that it was under no legal duty to furnish equipment and to fight the fire aboard a vessel docked at its facility or (b) its defense that an exculpatory provision of the Tariff absolving Georgia Ports Authority for loss of cargo by fire during the loading or unloading at the facility protects it from liability.

## XIV

*Findings of Fact and Conclusions of Law*

What has been said and found in this Opinion up to this point constitutes sufficient compliance with Rule 52(a). However, the following ultimate findings of fact and conclusions of law are entered:

1. The legal or proximate cause of the fire that broke out in hold No. 3 of the JALATARANG on the night of May 30, 1974, was the rupture of the drop light cord tied onto the rear of the coaming of the deep tank in order to provide illumination for the longshoremen in that hold discharging bales of burlap from the starboard aft wing.

2. Smith and Kelly was employed as Scindia's stevedore and was charged with unloading of the cargo of jute. Its employees had affixed the drop light in the position referred to. The officers and crew of the JALATARANG had no part in the placement thereof.

3. The rupture of the cord resulted from its contact with the steel runner leading to a rope-hook assembly (sling) furnished by the stevedore for the removal of cargo from the wings. The lead wire or runner was affixed to the hook on the block attached to the end of the cables of the gantry crane used by Georgia Ports Authority in discharging the cargo.

4. When the crane's upward pull commenced, the steel runner necessarily slid across the coaming of the deep tank before the bales (hooked to the sling) reach the square of the hatch from which they can be vertically lifted. Due to the heavy weight of the draft, great pressure is exerted by the runner against the coaming of the hatch above the deep tank.

5. The contact of the runner with the electric cord leading to the drop light re-

sulted in the severance of the latter. The accompanying short circuit produced a white hot arc that dropped below onto and ignited the highly inflammable cargo of jute and burlap bales.

6. It was foreseeable that the placement of the drop light at the point it was positioned would produce the result referred to in Finding No. 5.

7. The act in question amounted to a failure by the stevedore to exercise ordinary care as well as a clear violation of the OSHA longshoring standard or regulation that requires lighting wires for portable lights to be so arranged as to be free from drafts and moving equipment.

8. The stevedore's negligence and the violation of the standard referred to in Finding No. 7 was the legal or proximate cause of the loss of the cargo, including that part stowed in the other tank. The decision of the Master to flood both port and starboard tanks was a reasonable one and the resulting loss of cargo was a natural and probable consequence of the original act of negligence by Smith and Kelly.

9. Jute is a hazardous substance and when ignited, as here, the fire spreads very rapidly along the fibres in all directions producing large areas of flame. It is extremely difficult to localize or extinguish jute fires.

10. The failure to have or provide a fire extinguisher at the site of work in the hold is not a violation of the safety regulations unless forklifts are in operation. It is not a customary practice to do so. The extinguishers on the deck of the vessel were "readily accessible" within the meaning of that term.

11. The cargo interests have failed to carry the burden of proof of showing personal fault or neglect by the shipowner or management which would deprive the owner of the exemption from liability created by the fire statutes.

12. Even if there were negligence by the officers and crew in fighting the fire and by the shipowner in not providing adequate and accessible equipment, the evi-

dence as to its causal effect upon the cargo loss following ignition of the jute is highly speculative. The testimony as to the result of prompter response to the fire alarm and more efficient performance of fire fighting duties is insufficient to carry the burden of proof imposed on plaintiffs both as to causation and as to benefit of the immunity granted shipowners under the fire statutes.

13. Evidence is entirely lacking as to the existence of any causative effect on the cargo loss by reason of the acts or omissions of Georgia Ports Authority.

### Conclusions of Law

1. The stevedore, Smith and Kelly, is liable to the cargo owners for loss of the cargo.

2. The shipowner, Scindia, is not liable to the plaintiffs.

3. The Georgia Ports Authority is not liable to the plaintiffs.

4. The benefit of the exemption from liability created under the fire statutes does not extend to the stevedore by virtue of the so-called Himalaya Clause embodied in the bills of lading.

### ORDER

Judgment as to liability and non-liability of the parties will be entered pursuant to this Opinion. It will not constitute a final judgment. The question of damages has been reserved for subsequent determination. Consideration of the counterclaim of Scindia against the cargo owners for general average expenses in connection with extinguishing the fire will be deferred until the trial of the damage phase of the litigation. This decision renders moot the cross-claim of Scindia against Smith and Kelly in which it is alleged that the stevedore breached its implied warranty of workmanlike service in performing the stevedoring requirements of the JALATARANG.